UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

1. **BENYAMIN ANDREW PILANT**                              )
   **Individually and as natural and legal guardian to:**  )
2. **SAMUEL PHILIPS HAISTING PILANT;**                     )
3. **ROBERT ELIOT HAISTING PILANT; and**                   )
4. **ELIZABETH ANNA HAISTING PILANT**                      )
                                                           )
5. **REBECCA PILANT**                                      )
                                                           )
6. **YEHIZKIYAHO TZVI KATZ**                               )
   **individually and as natural and legal guardian to:**  )
7. **NOAM YEHUDA KATZ; and**                               )
8. **RONI HAVA KATZ**                                      )
                                                           )
9.. **BATSHEVA SHOHAM**                                    )
   **individually and as administrator to:**               )
10. **ESTATE OF YEHUDA SHOHAM**                            )
                                                           )
11. **ESTER DESTA**                                        )
   **individually and as natural and legal guardian to:**  )
12. **NECHAMA RINA DESTA; and**                            )
13. **SHIFRA BOSMAT DESTA**                                )
                                                           )
14. **CHANA MOSAI**                                        )
                                                           )
15. **RACHEL SIBONI**                                      )
                                                           )
   **Plaintiffs**                                          )
                                                           )   Civil Action No.
   **v.**                                                  )
                                                           )
   *FOREIGN STATE DEFENDANTS:*                             )
                                                           )
1. **ISLAMIC REPUBLIC OF IRAN**                            )
                                                           )
2. **THE SYRIAN ARAB REPUBLIC**                            )
                                                           )
   *AGENCIES AND INSTRUMENTALITIES OF*                     )
   *ISLAMIC REPUBLIC OF IRAN:*                             )
                                                           )
3. **THE ISLAMIC REVOLUTIONARY GUARDS**                    )
                                                           )
4. **AL QODS FORCE (A\K\A AL QUDS FORCE)**                 )

1

5.  **MINISTRY OF INFORMATION AND SECURITY**                )
                                                            )
6.  **AYATOLLAH ALI HOSEINI-KHAMENEI**                      )
                                                            )
7.  **MAHMUD AHMEDINEJAD**                                  )
                                                            )
8.  **ALI AKBAR HASHEMI RAFSANJANI**                        )
                                                            )
9.  **GENERAL MOHAMMAD ALI JA'AFARI**                       )
                                                            )
10. **GENERAL QASEM SOLEIMANI**                             )
                                                            )
11. **NATIONAL PETROCHEMICAL COMPANY**                      )
                                                            )
12. **NATIONAL IRANIAN OIL COMPANY**                        )
                                                            )
13. **ISLAMIC REPUBLIC OF IRAN SHIPPING LINES**             )
                                                            )
14. **IRAN AIRLINES**                                       )
                                                            )
15. **BANK MELLI**                                          )
                                                            )
16. **BANK SEPAH**                                          )
                                                            )
17. **BANK SADERAT**                                        )
                                                            )
    *AGENCIES AND INSTRUMENTALITIES OF*                     )
    *THE SYRIAN ARAB REPUBLIC:*                             )
                                                            )
18. **BASHAR AL ASSAD**                                     )
                                                            )
19. **THE REAL ESTATE BANK OF SYRIA**                       )
                                                            )
20. **THE COMMERCIAL BANK OF SYRIA**                        )
                                                            )
    **Defendants**                                          )

## COMPLAINT

Plaintiffs, through undersigned counsel, bring this action against the Islamic Republic of Iran

("Iran"), its officials, employees, agents, instrumentalities, and/or subdivisions and The Syrian

2

Arab Republic ("Syria"), its officials, employees, agents, instrumentalities, and/or subdivisions ("hereinafter agents and instrumentalities"), jointly and severally, and allege as follows:

1.      This action is brought by Plaintiffs for wrongful death and serious injuries suffered as a result of terror attacks that were authorized, directed and/or carried out by the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ") and Al-Aqsa Martyrs Brigade *a/k/a Al-Aqsa Martyrs Battalion, Tanzim, Fatah-Tanzim, and Fatah AAMB* ("AAMB") who, on information and belief, were directed, commanded, incited, provided with material and logistics support and/or resources by Defendants including financial, cover, sanctuary, technical assistance, safe harbor, weapons, explosive devices, recruitment, indoctrination, incitement and training. At all times relevant hereof, the Islamic Republic of Iran and The Arab Republic of Syria were designated state sponsors of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405 (j)).

## INTRODUCTION

2.      The Plaintiffs are United States citizens and/or family members or legal guardians/representatives of U.S. citizens or U.S. nationals who were seriously and permanently injured as a result of roadside bombings, shooting attacks, and other acts of terrorism targeted at innocent civilians, occurring in Israel.

3.      The suicide bombings, roadside bombings, shootings, murderous attacks, and other acts of terrorism by HAMAS, PIJ and the AAMB, involved the use of explosives, incendiary weapons and/or other lethal devices, which were constructed to cause the utmost death and bodily harm.  To this end, HAMAS, PIJ and the AAMB's attacks involved the intentional

delivery, placement, discharge and/or detonation and use of lethal devices in public places such as public buses and roads, which were used primarily and/or exclusively by civilians.

4.      These acts of terrorism were carried out in furtherance of Defendants, HAMAS, PIJ and AAMB's campaign of terrorism and were sponsored, supported, financed, incited and directed by and through the Defendants, directly and indirectly, jointly and severally.  Defendants knew that unarmed, innocent civilians, including U.S. citizens and nationals, frequented the places chosen by HAMAS/PIJ/AAMB for their terrorist attacks and that it was in all likelihood and foreseeable that U.S. citizens and nationals would be killed and/or seriously and permanently injured, terrorized and subjected to extreme mental and psychological trauma in their attacks.

5.      HAMAS and PIJ are terrorist organizations based in Damascus Syria and the Palestinian areas of the West Bank and Gaza Strip. AAMB is a terrorist organization based in the Palestinian areas of the West Bank and Gaza Strip. All three organizations are well-known throughout the world, having been designated as terrorist organizations by the United States, Israel, Canada and various European countries.   Since their establishment HAMAS, PIJ and the AAMB have committed hundreds of terrorist attacks in Israel, the Gaza Strip, and the West Bank, in which thousands of civilians were killed and tens of thousands were wounded, including U.S. citizens and nationals.

6.      In 1995 the US government designated HAMAS as a Specially Designated Terrorist Entity ("SDT"), at which time all of its assets subject to U.S. jurisdiction were blocked by E.O. 12947 and implemented regulations.  This designation was well known by all Defendants, during the relevant period of the Complaint.   Former HAMAS Political Bureau Chief and current Deputy Chief Mousa Abu Marzook was also designated a Specifically Designated Terrorist by the US Secretary of State on August 1995.

7.      On September 23, 2001 the US Department of State designated the AAMB as a foreign terrorist organization and on October 31, 2001 as a Specially Designated Terrorist Entity. Subsequently, on March 27, 2002, the US Treasury Department designated the AAMB as a Specially Designated Global Terrorist ("SDGT").

8.      On January 24, 1995, the US Department of Treasury designated the PIJ as a Specially Designated Terrorist Entity and on October 8, 1997 the U.S. Secretary of State designated PIJ as a Foreign Terrorist Organization ("FTO").   PIJ Chief Ramadan Shalah was also designated a Specifically Designated Terrorist by the US Secretary of State in 1995.

9.      HAMAS, PIJ and the AAMB use violent means to achieve their goals of establishing an Islamic Palestinian state in place of the State of Israel.

10.     Since the inception of these terrorist organizations, their alliance with Iran has been political, financial and military.  On the financial level, Iran has provided HAMAS/PIJ and AAMB directly and/or indirectly, with hundreds of millions of dollars in funding, annually. PIJ's budget is almost entirely funded by Iran.  On the military level, Iran has been and continues to be the primary source of weapons and explosives and actively trains HAMAS/PIJ/AAMB "military activists," in weapons usage, bomb making, espionage, counter-espionage, clandestine communications, and ambush preparation using IED's on Iranian, Lebanese, Sudanese, and West Bank territory. By the early 1990s HAMAS had even established a permanent structure in the Iranian capital from which it could actively recruit new HAMAS members.

11.     To carry out its policy of terrorism and support for terrorist groups, Iran has created and used its government-controlled organizations, its so-called "charitable" foundations and government owned businesses, including its intelligence ministry, foreign affairs ministry and its the military, and other entities which are part of the government and are directly answerable to

and receive instructions from the regime in power (lead by Defendant Supreme Leader Ayatollah Khamenei).

12.     Iran's financial sponsorship to HAMAS/PIJ and AAMB is largely through funding it receives from its state-owned and controlled businesses, as well as state-owned and controlled "charitable institutions" (some actually alter-egos of Iran). Iran utilizes Defendants' businesses and cut-out entities in multiple countries to create complex, multi-layered structures to siphon revenues and launder monies provided to HAMAS/PIJ and AAMB and to transport weapons and material to those HAMAS/PIJ/AAMB terrorist cells. Iran's logistical, military and intelligence support to HAMAS/PIJ/AAMB comes through its dominant military branch - the Iranian Revolutionary Guards Corps (IRGC), Iran's Ministry of Intelligence and Security (MOIS) and its various ministries, whose senior officers both past and present have significant ties to the IRGC. (See, Salazar v. Islamic Republic of Iran, 370 F.Supp. 2d 105, 116 (D.D.C. 2005) (analogizing the IRGC to the Ministry of Intelligence and Security Information (MOIS) for purposes of liability, and concluding that both must be treated as the state of Iran itself).

13.     Similar is the relationship between HAMAS/PIJ and AAMB's and Syria. Syria carries out its proxy war against Israel using terrorist entities such as HAMAS/PIJ and the AAMB to execute its terrorist attacks. Almost from their establishment, HAMAS/PIJ and the AAMB have received continuous and substantial political, military and financial support from Syria. Syria has allowed HAMAS and PIJ to set up headquarters in Damascus (as well as in Lebanese controlled Syria). Syria has hosted military/terrorist training camps for recruits of HAMAS/PIJ/AAMB, using Syrian army basis and facilities. Syria has provided safe-haven for senior terrorist leaders including current HAMAS leader Khaled Mashal and regularly allows weapons used directly and indirectly by HAMAS, PIJ and the AAMB to pass through Syria with government knowledge

and help (as well as allowing weapons and terrorists to pass through Syria to attack US civilians and military personnel in Iraq). Syria has authorized the funneling of financial support to HAMAS/PIJ/AAMB cells from and through Syria. Syria has invited HAMAS and PIJ leaders to fundraise in Damascus and has hosted meetings between HAMAS, PIJ, Hezbollah( a/k/a Hizballah,Hizb'allah) and Iran for purposes of promoting joint terror activity against civilian populations in Israel and against Jewish civilians and institutions around the world. Syria's government ministries have worked in conjunction with HAMAS/PIJ/AAMB and used its military intelligence to provide logistical support for coordinating, planning and executing terror attacks against Israel and its population from the safety of Syrian soil. Syria has used its banking system to launder money for HAMAS, PIJ and AAMB and support terrorist entities financially by setting up "charities" to support HAMAS, PIJ, the AAMB. The Syrian regime has been a key factor in the terror axis of Iran, Syria and HAMAS, PIJ and the AAMB.

14.     All of the defendants named in the Complaint have played key roles either directly or indirectly, in materially supporting HAMAS, PIJ and AAMB's infrastructure and its terrorist activities, financially, politically, logistically and militarily, thereby enabling these agents of defendants to carry out the vicious terror attacks against Plaintiffs.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to the Torture Victims Protection Act of 1991 ("TVPA") P.L. 102-256 and the laws of the jurisdiction of the residence of the Plaintiffs.

16.     This court has subject matter jurisdiction over this action pursuant to  28 U.S.C. §§1330(a), 1331, 1332(a) (2); and 28 USC 1605A or in the alternative 1605(a)(7).

17.     This court exercises in personam jurisdiction over the parties designated as Defendants pursuant to 28 USC Section 1605A or in the alterative 28 USC 1605(a)(7).

18.     Plaintiffs are U.S. citizens and/or U.S. nationals.                                :

19.     Defendants are subject to suit in the courts of the United States pursuant to 28 U.S.C.

§1605A, an exception to the Foreign Sovereign Immunities Act allowing suit against foreign

state sponsors of terror, for extrajudicial killings and other terrorist actions committed by said

states and their agents.  The FSIA has been construed to apply to individuals (official, employee,

or agent of a foreign state designated as a state sponsor of terrorism) for acts performed in their

official capacity on behalf of either a foreign state or its agency or instrumentality. *Flatow v.*

*Islamic Republic of Iran,* 999 F. Supp 1 (D.C. 1998) and 28 U.S.C. §1603[1]

20.     Plaintiffs bring this action against Defendants Syria and Iran and their agencies,

instrumentalities and subdivisions so as to assert a cause of action under the FSIA, 28 U.S.C.

§1605A and TVPA including wrongful death, assault and intentional infliction of emotional

distress resulting in damages for loss of solatium/consortium and/or loss of services, and such

other monetary and equitable relief.[2]

21.     Plaintiffs bring their claims within 28 U.S.C. §1605A(c)(2)'s statute of limitations.

22.     Venue in this Court is proper in accordance with the provisions of 28 U.S.C. §1391(f)(4),

which provides in pertinent part that a civil action against a foreign state may be brought in the

United States District Court for the District of Columbia.[3]

---

[1] The definition of "foreign state" pursuant to FSIA 28 USCS § 1603 includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state. See *Foremost-McKeeson,* 905 F.2d at 446 (quoting -*Elahi v. Islamic Republic of Iran,* 124 F. Supp. 2d 97, 108 (D.D.C. 2000).
[2] See, *Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53, 56 (D.D.C. 2008).
[3] Jurisdiction is proper as to the defendants who are not a foreign state or instrumentality (ATA Claim) based on diversity of citizenship.

## PARTIES

## PLAINTIFFS

23.     Plaintiff, Benyamin Andrew Pilant, is an American citizen.  He currently lives with his wife Rebecca and their children, Samuel Philips Haistings Pilant, Robert Eliot Haistings Pilant and Elizabeth Anna Haistings Pilant, all of whom are U.S. citizens and are claimants in this action.

24.     On the evening of December 12, 2001, Benyamin Andrew Pilant boarded the Number 189 bus in Bnei Brak, Israel.  He was on his way home from work when the passenger bus was attacked by a terrorist named Assem Rayhan.

25.     The terrorist began his attack by detonating a roadside bomb.  The bomb caused the bus to swerve and run off the road.  Once the bus was disabled, the terrorist opened fire with an automatic assault rifle on the passengers causing multiple deaths and a myriad of other injuries, including injury to Plaintiff, Benyamin Andrew Pilant.

26.     The attacker, Assem Rayhan, was a member of the HAMAS terrorist organization which took responsibility for the attack.

27.     Plaintiff has suffered serious emotional and psychological trauma as a result of being brutally attacked coupled with witnessing the horrific sight of the wounded and dead.  The trauma of the attack has greatly affected his daily life, including his employment, marital and familial relationships.

28.     Although more than nine years have passed since this horrific attack, Plaintiff, Benyamin Andrew Pilant, continues treatment for the psychiatric and psychological trauma he experienced during the assault.  Plaintiff's treatment includes the use of prescription medications as well as marriage counseling.

29.     Plaintiff, Yehizkiyaho Tzvi Katz, is a U.S. citizen. He currently lives in Israel with his wife Orit and children Ruth, Noam Yehuda, Roni Hava, Itzhak and Amichai Katz.

30.     On September 26, 2002, Mr. Katz and his family were traveling in Beit Hagai, near Hebron. They were traveling in separate vehicles with Orit Katz and children, Ruth, Noam Yehuda and Roni Hava in the lead vehicle and Yehizkiyaho Katz and the remainder of the children, Itzhak and Amichai Katz, following behind. Suddenly and unprovoked, HAMAS members opened fire on Orit Katz's vehicle.

31.     As a result of the attack, Orit Katz, wife of Yehizkiyaho Katz, suffered physical injuries to her hand which required surgery and hospitalization.

32.     The children who were in the vehicle with Mrs. Katz suffered a myriad of injuries, including shrapnel to the head, which required stitches to one child and a weeklong hospital stay for another. Other injuries include psychological trauma and developmental injuries.

33.     At the time of the attacks, Ruth, Noam Yehuda, and Roni Hava were minors.

34.     Plaintiff Yehizkiyaho Tzvi Katz is the father of the victims, Ruth Katz, Noam Yehuda Katz and Roni Hava Katz. He brings this action in his own right, and as the natural guardian and legal and personal representative of Noam Yehuda Katz and Roni Hava Katz.

35.     Plaintiff Batsheva Shoham is a US citizen. She currently lives in Israel with her husband Benjamin Shoham and her minor children Shmuel, Lea, Chaim and Moshe Shoham.

36.     On June 5, 2001, Batsheva and Benjamin Shoham were ambushed by two AAMB members, who unprovoked, threw stones and rocks at the vehicle of the young couple as they were driving on a public road near Shilo in the West Bank, just minutes from their home. Also, in the vehicle was their first born child, an infant of five months, Yehuda Shoham. According to the their signed confessions, AAMB members Muayad Kafina and Saker Saleh admitted to

perpetrating the attack, which was designated as an act of terrorism by Prime Minister Ariel Sharon, Israel's Ministry of Foreign Affairs, and by Yehuda Lauery- Permanent Representative to the UN General Assembly Council.

37.     One of the stones, which was described as "the size of a boulder," shattered the windshield and hit five-month old Yehuda Shoham. As a result, Yehuda Shoham was critically injured sustaining a blunt head injury and brain edema. After a week of hospitalization, wherein Yehuda Shoham endured severe pain and suffering, being hooked up to a life support machine, Yehuda died in the hospital with his parents by his side.

38.     Yehuda Shoham was the firstborn son of plaintiffs Batsheva and Benjamin Shoham and the brother of Shmuel, Lea, Chaim and Moshe Shoham.

39.     As a result of the Plaintiff's experience of violence aimed at herself, her husband and her child, and witnessing the sight of her child suffering from his critical injuries and his subsequent death, Batsheva Shoham experienced serious emotional and psychological trauma, that has affected her daily life including her marital and family life and her employment capability.

40.     To this day Batsheva Shoham continues to suffer from the trauma of violently losing her child.

41.     Plaintiff Batsheva Shoham is a US citizen and is the mother and the administrator of the Estate of Yehuda Shoham.

42.     Plaintiffs Ester Desta, Nechama Rina Desta and Shifra Bosmat Desta are all US citizens currently residing in Israel.

43.     On June 19, 2002, a suicide bomber named Saed Awadeh, a member of the Fatah-AAMB terrorist organization, blew himself up at crowded civilian bus stop at the French Hill intersection in northern Jerusalem, killing seven and injuring thirty-nine people, including plaintiffs Esther

Desta (a/k/a Phyllis Elaine Eigner) and her daughters Nechama Rina Desta and Shifra Bosmat Desta. Esther sustained serious psychological trauma and severe anxiety, and her two minor daughters, Nechama-Rina Desta and Shifra-Bosmat Desta suffered serious psychological trauma, and developmental issues as a result of the attack.

44.     Mazen Farikh, a senior Fatah-AAMB member and Naef Abu Sharha, a senior operative and fugitive from justice, of the related Fatah-Tanzim infrastructure, took responsibility for the attack. In February 2004 Israel Defence Forces ("IDF") and police officers confiscated funds held in bank accounts of Naef Abu Sharha at branches of the Arab Bank in Cairo, Amman and Ramallah, in connection with funds received by these terrorist organizations for carrying out numerous deadly attacks, including the French Hill suicide bombing.

45.     Plaintiff Chana Musai is a US citizen and mother to victim Dvir Musai. She currently lives in Israel with her husband Mordechai Musai and children Dvir, Ariel, Moriya, Harel-David, Yedidia and Ya'ara Musai.

46.     On June 11, 2002, Dvir Musai, Chana Musai's fourteen year old son stepped on a road-side explosive charge while walking with his friends from their school to their school bus. According to the indictment and trial, Alaa Issa Muhammad Munasirah, a member of the AAMB, was involved in this terror attack.

47.     As a result of the explosion, Dvir sustained multiple trauma and serious injuries including lacerations to perineum, fractures of left and right leg and tibia, burns to his calves requiring skin graft surgery and debridement, colostomy, trauma to left eye. His injuries required a stay in the hospital for over two (2) months and continuing rehabilitation. His mother, Chana Musai, the victim's natural guardian was constantly at his bedside during his rehabilitation. Chana Musai

suffered and continues to suffer serious psychological trauma, as result of the attack and injuries to her son, whose still suffers from his injuries.

48. Rachel Siboni is a US citizen. On April 17, 2006, a PIJ suicide bomber, named Samer Hamad, blew himself up in a fast food restaurant in the old central bus station in Tel-Aviv, killing nine and injuring eighty people, including Hana Annette Ichai, sister of plaintiff Rachel Siboni, a US citizen. As a result of the attack, Hana Annette Ichai, 71 years old, suffered serious injuries and multiple trauma including a penetrating injury of the abdomen, tear of the small bowel, multiple penetrating wounds and foreign bodies of chest, back and extremities, right distal femur open comminuted fracture, right distal fibula and tibia open comminuted fracture and lacerations to face requiring over a month of hospital stay and continuing rehabilitation. Her sister, Rachel Siboni 76 suffered serious psychological and emotional trauma as a result of the vicious assault on her sister.

49. All of the above Plaintiffs' injuries and trauma were caused by the willful and deliberate acts of terror by HAMAS/PIJ or the AAMB who were acting under the direct and indirect sponsorship and/or direction and/or agency of the named Defendants, who provided material support to HAMAS/PIJ and the AAMB to enable them to carry out the attacks on the Plaintiffs.

50. The actions of the agents and co-conspirators of the Defendants as set forth below, and those who were substantially aided and abetted by defendants, inflicted serious injury and mental distress upon the Plaintiffs and their families.

## DEFENDANTS

## FOREIGN STATES

51. Defendant, the Islamic Republic of Iran, is a foreign state which at all times alleged hereinafter was designated a state sponsor of terrorism pursuant to Section 6(j) of the Export

Administration Act of 1979 (50 U.S.C. App. §2405 (j)), §620A of the Foreign Assistance Act, 22 U.S.C. §2371; and §40(d) of the Arms Export Control Act, 22 U.S.C. §2780(d).

52.     Pursuant to the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §1602 et seq., U.S. citizens may file lawsuits in federal district court against foreign states so designated as sponsors of terrorism. Iran maintains an Interest Section at the Embassy of Pakistan, 2209 Wisconsin Avenue, N.W., Washington, D.C. 20007.

53.     Iran, through its officials, employees, agents and instrumentalities, has financed, supported, directed, encouraged, incited, provided weapons, explosives, training and safe-harbor, contributed, aided and abetted and conspired with the terrorists responsible for the injuries of the Plaintiffs in this action. These individuals and entities, owned and controlled by the Iranian regime, qualify as agents and/or instrumentalities and/or *alter egos* of Iran within the meaning of §1603(a) of the FSIA.[4] As agents and instrumentalities of Iran and senior officers of such instrumentalities, they maintain a presence and/or interest in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, at 622 Third Ave. New York, NY 10017 and\or through the Iranian Interest Section within the United States at the Embassy in Pakistan at 2209 Wisconsin Avenue, N.W., Washington, D.C. 20007.

54.     Defendant Syria is a foreign state designated by the U.S. State Department as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405 (j)).

55.     Syria's status as a designated state sponsor of terrorism at all relevant times alleged herein enables U.S. citizen to file lawsuits against it pursuant to the FSIA, 28 U.S.C.S. §1602 et seq.

---

[4] The definition of "foreign state" in the FSIA includes agencies and instrumentalities of a foreign state. See 28 U.S.C. § 1603(a)(b). See also *Foremost-McKeeson v. The Islamic Republic of Iran*, 905 F.2d 438, 446 (DCCir.1990)

Syria maintains an interest within the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

56.     Syria, through its officials, employees, agents and instrumentalities, has financed, supported, directed, encouraged, contributed, incited, provided weapons, explosives, training and safe-harbor, aided and abetted and conspired with the terrorists responsible for the injuries of the Plaintiffs in this action. These individuals and entities owned and controlled by the Syrian regime qualify as agents and/or instrumentalities and/or *alter egos* of Syria within the meaning of §1603(a) of the FSIA.

57.     As agents and instrumentalities of Syria and senior officers of such instrumentalities, they maintain a presence and/or interest in the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

## AGENTS AND  INSTRUMENTALITIES OF IRAN

58.     The Supreme Leader and head of state, Ayatollah Ali Khamenei is the primary authority in the Iranian government, and yields the ultimate religious power. Khamenei has directly and indirectly incited, encouraged, supported and directed terrorist organizations including HAMAS, PIJ, and the AAMB in their vicious attacks against U.S. citizens and Israeli and Jewish civilians and institutions worldwide. In a December 15, 2000 sermon, Supreme Leader Ali Khamenei declared, "*The cancerous tumor called Israel must be uprooted from the region.*" One month later, he elaborated, "*The perpetual aim of Iran is the obliteration of Israel.*" Ayatollah Ali Khamenei has been found to be an instrumentality of Iran for purposes of liability and damages under the FSIA. See, e.g., *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998).

59.     The Islamic Revolutionary Guards Corp (IRGC) a/k/a The Pasdaran, has been designated a terrorist organization pursuant to Executive Orders 13224 and 13382 (2007). The IRGC is

directly controlled by the Ayatollah Ali Khamenei and is the dominant force within the ruling establishment in Tehran today. The IRGC holds a controlling number of positions in the Iranian government and its economy.

60.    The Islamic Revolutionary Guards Corp - Al Qods Forces (a/k/a "Qods," "Qudes Force," "Quds Force" or "Qods Force") has been designated a terrorist entity pursuant to Executive Order 13224, and 13382 (2007).

61.    Iran's terrorist training bases are operated by the IRGC, primarily through its Qods force. The Qods Force activities range from establishing educational systems for indoctrination and recruitment and for the civilian infrastructure supporting Iran and its radical ideology, to operating armed terrorist and guerilla cells around the world, conducting international espionage, WMD, including nuclear, and advanced missile procurement and proliferation, and acting to subvert secular, pro-Western Arab-Muslim regimes.

62.    The Qods Force has provided HAMAS, PIJ and the AAMB directly and indirectly with training in the use of explosives, improvised explosive devices ("IED's") firearms, sophisticated weapons such as Katyusha rockets and Strela antiaircraft missiles, assassinations, espionage, clandestine communication and kidnapping, as used in the attacks described herein.

63.    Upon information and belief, the IRGC by and through the Qods Force and its commanders General Mohammad Ali Ja'afari former Brigadier General of the IRGC and Commander of the IRGC land forces from 1991-2005, and General Qasem Soleimani, Qods Commander since 2000 (appointed by then President Ali Akbar Hashemi Rafsanjani), both of whom have been designated by Treasury Department in consultation with the Department of State and Justice Department pursuant to E.O. 13382, at all times relevant to this Complaint, directed, financed, materially supported, aided and abetted and/or conspired with those who

carried out the attacks as described above, by providing the necessary weapons, explosives "technical" and military training, finance, as well as logistical, tactical, organizational support and safe haven to HAMAS, PIJ and the AAMB, who were responsible for executing the vicious attacks against the Plaintiffs.

64.      In his official capacity as Iranian president, President Mahmud Ahmedinejad, a former commander of the IRGC and close advisor of the Ayatollah Khamenei since the 1980s, at all times relevant to this Complaint, materially supported, aided and abetted and/or conspired with those who carried out the attacks as described herein, by encouraging, financing, promoting, supporting, enabling, inciting, glorifying and legitimizing the execution of terrorist attacks by terrorist organizations including HAMAS, PIJ, AAMB against U.S. citizens interests, and Jewish/Israeli targets worldwide.

65.      Former Iranian President Ali Akbar Hashemi Rafsanjani wielded great political power over the Iranian regime during the years relevant to the attacks against Plaintiffs. Rafsanjani, former President and also Speaker of the Iranian Parliament, currently Chairman of The Expediency Discernment Council and Assembly of Experts, one of the creators of the IRGC, and believed to be the right-hand man to Ayatollah Khamenei, was instrumental in planning, and hosting meetings between Iran and worldwide terrorist organizations including HAMAS, PIJ and AAMB, to promote Iran's terrorist agenda in the Middle East. In his capacity as president and holder of key offices high in the Iranian regime, Rafsanjani materially supported, aided and abetted and/or conspired with those who carried out the attacks as described above, by financing, encouraging, promoting, supporting, enabling, inciting, glorifying and legitimizing the execution of terrorist attacks against U.S. citizens and interests and Israeli/Jewish targets worldwide, by terrorist organizations including HAMAS, PIJ and the AAMB.

66.    National Petrochemical Company ("NPC") is owned by the Iranian government and upon information and belief controlled by IRGC and an agency and instrumentality of the Iranian government.  NPC aids and abets HAMAS, PIJ and AAMB by providing cover and camouflage for the illicit transport of weapons and explosives as well as clandestine and open sources of monies to finance international terrorism.  For example, while most smuggling operations likely are not detected, on November 3, 2009, the Israeli Navy intercepted on the high seas a ship procured by the Islamic Republic of Iran Shipping Lines, which had over 500 tons of high grade explosives and weapons falsely packaged, documented, and concealed as polyethylene pellets shipped by NPC, purportedly to a commercial entity in the middle east but actually to Hezbollah in Lebanon, for, upon information and belief, ultimate smuggling into Gaza for HAMAS, PIJ and AAMB.  The shipment contained over 2000 107mm rockets, approximately 700 122mm rockets and fuses, approximately 5700 60mm mortar shells, 2300 81mm mortar shells, 780 120mm mortar shells, 3000 106 mm recoilless artillery shells, 20,000 hand grenades, and 570,000 rounds of light ammunition.

67.    Former President Rafsanjani denied reports of the weapon seizure on his families' website Ayande.

68.    The Islamic Republic of Iran Shipping Lines ("IRISL") Iran's national maritime carrier, is a global operator with a worldwide network of subsidiaries owned by Iran and upon information and belief, controlled by IRGC.  IRISL has been designated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") for nuclear and weapons proliferation activity as well as falsifying documents and using deceptive schemes to shroud their involvement in illicit and illegal commerce, which includes aiding terrorism.

69.     According Treasury Under-Secretary for Terrorism and Financial Intelligence, Stuart Levey, in written testimony before the Senate Foreign Relations Committee on June 22, 2010, *"Since January 2009, IRISL has been publicly implicated in multiple shipments of arms-related material from Iran to Syria in violation of UN Security Council Resolution 1747" [prohibiting arms shipments to Hezbollah].*

70.     In January 2002, Israel intercepted over 50 tons of weapons and explosives that were illegally and clandestinely shipped from Iran to Hamas in the Gaza Strip.

71.     Upon information and belief, at all relevant times of this Complaint, IRISL was directly and indirectly involved in illegal shipments of arms to terrorist organizations and designated state sponsors of terrorism, including Syria, HAMAS, PIJ and AAMB and has provided significant and material support, and aided and abetted terrorism perpetrated by HAMAS, PIJ and AAMB, including the attacks upon Plaintiffs.

72.     The Ministry of Information and Security (MOIS) a/k/a Ministry of Intelligence and Security has consistently been found by this Court to be an instrumentality of Iran for purposes of liability and damages under the FSIA.

73.     The MOIS is the intelligence service of Iran, responsible for coordinating Iran's international terrorist activities and is one of the most powerful ministries of the Iranian government. The MOIS is responsible for intelligence and espionage used to support terrorist operations, for liaison activities which support terrorist groups such as Hezbollah, HAMAS, PIJ and AAMB and in the overall planning and executing of terror attacks abroad. It is logistically supported by the Ministry of Foreign Affairs which enables MOIS and IRGC personnel to travel overseas under diplomatic cover.  In fact, MOIS personnel are either delegated as diplomats in Iranian embassies and consulate offices or as Ministry of Guidance and Propaganda

representatives. The MOIS has been found to be directly involved in directing and approving operational echelons and chosen targets including attacks like the ones described in the Complaint herein, against US and Israel citizens and institutions. MOIS materially supported, aided and abetted and/or conspired with those who carried out the attacks as described above, by financing, encouraging, promoting, supporting, enabling, inciting, glorifying and legitimizing the execution of terrorist attacks against U.S. citizens and interests and Israeli/Jewish targets worldwide, by terrorist organizations including HAMAS, PIJ and the AAMB

74.     The National Iranian Oil Company ("NIOC") a parasternal corporation owned and controlled by the Iranian government, provided material support, aided and abetted and conspired with those who carried out the attacks herein, by, among other actions, funneling funds to the IRGC and the Iranian government with knowledge that Iran used those funds to support terrorist activities and terrorist organizations including HAMAS, PIJ and the  AAMB (and Hezbollah). Upon information and belief, NIOC is a major source of Iran's financing of its terror and of IRGC activities abroad.  As such the U.S. Treasury has listed the NIOC, and its affiliates, as companies with whom U.S. citizens and companies are prohibited form transacting business. (See, Iranian Transactions Regulations, 31 C.F.R. Part 560).

75.     The Iran National Airlines Corporation ("Iran Air") is an Iranian corporation wholly owned and controlled by the Iranian government. *Marschalk Co. v. Iran Nat'l Airlines Corp.,* 518 F.Supp. 69, 88 (S.D.N.Y. 1981); *Comet Enters. v. Air-A-Plane Corp.,* 128 F.3d 855, 859 (4th Cir. VA 1997).

76.     Upon information and belief, at all times relevant to this Complaint, Iran Air materially supported and/or aided and abetted and conspired with those who carried out the attacks herein by providing transport and funneling funds to the Iranian government with knowledge that the

government used those funds to support its terrorist activities. Iran Air further assisted Iran's efforts to export terrorism by transporting weapons, explosives, rockets, funds and individual terrorists for the purpose of committing terrorist acts in foreign countries and/or recruiting members of HAMAS, PIJ and AAMB or other terrorist organizations to carry out terrorist attacks in Israel and in other countries.  Upon information and belief, Iran Air's passenger and cargo planes have been used to transfer weapons, including rockets, through Syrian airports, for use by terrorist organizations including Hezbollah and HAMAS.  Additionally, the IRGC and the MOIS "unofficially" have used Iran Air to travel abroad (i.e. Syria) and collect intelligence, plan attacks and support terrorist groups such as HAMAS, PIJ and AAMB.

77.    Bank Melli, Bank Saderat and Bank Sepah are owned and controlled by the Iranian government and are agents and instrumentalities of Iran.  Upon information and belief, at all times relevant to this Complaint, the above-mentioned banking institutions have materially supported, aided and abetted, laundered monies, provided extensive banking services, including clandestine international money transfers, and conspired with those who carried out the attacks herein by contributing to and supporting the Iranian regime and Iran's sponsored terrorist organizations including HAMAS, PIJ, AAMB.   Further, upon information and belief these banking institutions have knowingly kept accounts for the Iranian government, and the IRGC and its commanders, with the knowledge that Iran uses the accounts to support terrorist groups such as Hamas, PIJ and others. *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406 (1995).

78.    Bank Saderat has been designated under Executive Order 13224 for its significant role in facilitating and supporting the activities of terrorist organizations, including Hezbollah, HAMAS, the PFLP-GC, and PIJ.

79.    On June 22, 2010, Treasury Under-Secretary for Terrorism and Financial Intelligence, Stuart Levey, in written testimony before the Senate Foreign Relations Committee, testified that *"...there is a vast body of public information demonstrating that many of Iran's banks are deeply involved in facilitating its proliferation-sensitive activities and other forms of illicit conduct. Over the last several years, we have designated fifteen Iranian banks under Executive Order (E.O.) 13382 for facilitating Iran's nuclear proliferation activities, and one bank under E.O. 13224 for providing support to international terrorism...Banks like Bank Melli have also provided financial services to the IRGC, and Bank Saderat has facilitated the transfer of millions of dollars to terrorist groups. In the course of undertaking these transactions, Bank Melli employed deceptive banking practices, like requesting that its name be removed from financial transactions to obscure its involvement from the international banking system."*

80.    Upon information and belief, Bank Melli provides financial services for illicit Iranian front companies, such as the Alavi Foundation Inc. of New York. Bank Melli has been found by OFAC to provide services to designated terrorist organizations IRGC and Qods. Bank Melli and its branches and subsidiaries have been designated by the OFAC as proliferators of weapons of mass destruction under Executive Order 13382 (2005) as well as by the European Union and Australia. The Treasury Department has stated that Bank Melli provides banking services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the U.N. for their involvement in those programs such as handling transactions in for Bank Sepah.

81.    Iran's state-owned Bank Sepah is the fifth-largest, Iranian state-owned bank. Bank Sepah has been designated under E.O. 13382 as *"a terrorist financier"* and blacklisted by United Nations Security Council Resolution 1747.

82.     Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hezbollah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas

### AGENCIES AND INSTRUMENTALITIES OF SYRIA

83.     At all times relevant to this Complaint, President Bashar al Assad has been the President of Syria and the Commander-in-Chief of the Syrian Armed Forces (since June 10, 2000). Upon information and belief, President Bashar al Assad has directed, incited, materially supported, aided and abetted and conspired with those who carried out the attacks herein by providing material support and resources including, funding, safe-haven, training facilities, logistics, security, intelligence, location and assistance in transferring weapons to terrorist organizations directly and indirectly. Under the tyrannical rule of President Bashar Syria's support for terrorist organizations has increased, especially to HAMAS, PIJ, AAMB and Hezbollah. As an agent of Syria, President Bashar al Assad, maintains an interest within the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

84.     Defendant The Arab Republic of Syria ("Syria"), through its employees, officials, agents, ministries and instrumentalities, has financed, supported, directed, encouraged, incited, contributed, aided and abetted and conspired with the terrorists responsible for the injuries of the

23

Plaintiffs. These individuals and entities, owned and controlled by the Syrian regime, qualify as agents and/or instrumentalities and/or alter egos of Syria within the meaning of §1603(a) of the FSIA.[7]  As agents and instrumentalities of Syria and its senior officers, these entities and individuals maintain a presence and/or interest within the United States at the Syrian Embassy located at 2215 Wyoming Avenue, N.W. Washington, D.C. 20008.

85.    Upon information and belief, the Syrian Ministry of Foreign Affairs acted as a liaison between the axis of Iran, HAMAS, PIJ, AAMB and Syria (and other foreign terror states) and assisted in promoting terror activities by both providing and transferring necessary intelligence, documentation, passports and visas, equipment and weapons via diplomat pouch.

86.    Upon information and belief, in or about May 2001, Defendant Bhashar Al Assad caused to be established a "charity" called The Popular Arab Syrian Committee for Supporting the Intifada and Resisting the Zionist Plan (the "Committee").  Ahmad Abdul Karim, retired colonel of the Syrian army, was appointed its Chairman and tasked with collecting donations to support the Al Aqsa Intifada, and launder such funds in order to transfer them to terrorists and their families in the West Bank and Gaza regions. Upon information and belief, at all times relevant to this Complaint, the Committee materially supported, aided and abetted and conspired with those who carried out the attacks herein by providing necessary financing and funding in support of such terrorist organizations such as HAMAS, PIJ,  AAMB directly and indirectly.  Since its establishment, the Committee has collected and laundered approximately $20 million, which has been used to aid, support and finance terrorists such as those responsible for the Plaintiffs' injuries and suffering.

---

[7] The definition of "foreign state" in the FSIA includes agencies and instrumentalities of a foreign state. See 28 U.S.C. § 1603(a)(b). See also *Foremost-McKeeson v. The Islamic Republic of Iran*, 905 F.2d 438, 446 (DCCir.1990)

87.     Sheikh Ahmad Badr Al-din Hassoun, who was appointed by President al Assad as the Grand Mufti of Syria, is also a member of the Committee. Upon information and belief, at all times relevant to this Complaint, Sheikh Ahmad Badr Al-din Hassoun aided and abetted and conspired with those who carried out the attacks herein by providing the incitement, encouragement and support of terrorist groups, through hate-speeches and propaganda to carry out vicious attacks against U.S., Western and Jewish/Israeli targets With the backing of the Syrian government, which pays the Grand Mufti's salary, Sheikh Hassoun has supported, encouraged, incited and recruited members of terrorist organizations to carry out acts of national and international terrorism.

88.     The Mufti of Aleppo, Sheikh Mahmuod Akkam, has been one of the prominent Islamic leaders in Syria.  In December 2001, the Sheikh issued a Fatwa [Islamic religious ruling] holding that the killing of Israeli civilians was permissible and even a duty under Islamic law. Specifically, Sheikh Akkam stated, "The Jews in Palestine are considered to be fighters and combatants even if they are not soldiers. Because they came to an area and committed aggression against it, therefore they are all fighters and consequently it is permissible to kill them." Upon information and belief, at all times relevant to this Complaint, the Mufti of Aleppo, Sheikh Mahmuod Akkam aided and abetted and conspired with those who carried out the attacks herein by providing the incitement, encouragement and support to terrorist groups such as Hamas, PIJ AAMB and others in such hate-speeches and propaganda, to continue carrying out violent attacks against Western and Jewish/Israeli targets.

89.     The Real Estate Bank of Syria ("REB") is wholly-owned and controlled by the Syrian government and is thus an agent and instrumentality of Syria. Upon information and belief, at all times relevant to this Complaint, the REB maintained and managed bank accounts of the

Committee, and knowingly financed and supported terrorist organizations directly and indirectly including HAMAS, PIJ and AAMB.

90.     The Commercial Bank of Syria ("CBS") is wholly owned and controlled by the Syrian government and thus is an agent and instrumentality of Syria. At all times relevant to this Complaint, CBS maintained and managed bank accounts of the Committee, and knowingly financed and supported terrorist organizations including HAMAS, PIJ and AAMB. CBS is well known for its support of terrorism and involvement in money laundering and was designated by the U.S. Treasury Department as a financial institution involved in money laundering pursuant to §311 of the USA Patriot Act.

## NON PARTY ACTORS

## HAMAS

91.     Harakat al-Muqawamah al-Islamiyya is Arabic for "The Islamic Resistance Movement" and is known most commonly as HAMAS.

92.     HAMAS was founded by Sheikh Ahmed Yassin in 1987. In August 1988, HAMAS published its charter, the Covenant of the Islamic Resistance Movement (the "HAMAS Charter"), which states that the purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel and its citizenry and innocent bystanders through violent jihad. The HAMAS Charter is replete with xenophobic, anti-Semitic references and openly calls for a genocidal war of ethnic cleansing against Jews in "Palestine".

93.     Specifically, the HAMAS charter states (in part):

"Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it. (Preamble)

The Islamic Resistance Movement aspires to the realization of Allah's promise, no matter how long that should take. The Prophet, Allah bless him and grant him salvation, has said: The Day of Judgment will not come about until Moslems fight the Jews (killing the

Jews), when the Jew will hide behind stones and trees. The stones and trees will say O Moslems, O Abdulla, there is a Jew behind me, come and kill him. (Article 7)

Allah is its target, the Prophet is its model, the Koran its constitution: Jihad is its path and death for the sake of Allah is the loftiest of its wishes. (Article 8)

Initiatives and so-called peaceful solutions and international conferences, are in contradiction to the principles of the Islamic Resistance Movement....There is no solution for the Palestinian question except through Jihad. Initiatives, proposals and international conferences are all a waste of time and vain endeavors." (Article 13)

For a long time, the enemies [Jews] have been planning, skillfully and with precision, for the achievement of what they have attained....With their money, they took control of the world media, news agencies, the press, publishing houses, broadcasting stations, and others. With their money they stirred revolutions in various parts of the world with the purpose of achieving their interests and reaping the fruit therein. They were behind the French Revolution, the Communist revolution and most of the revolutions we heard and hear about, here and there. With their money they formed secret societies, such as Freemasons, Rotary Clubs, the Lions and others in different parts of the world for the purpose of sabotaging societies and achieving Zionist interests. With their money they were able to control imperialistic countries and instigate them to colonize many countries in order to enable them to exploit their resources and spread corruption there...They were behind World War I, when they were able to destroy the Islamic Caliphate, making financial gains and controlling resources. They obtained the Balfour Declaration, formed the League of Nations through which they could rule the world. They were behind World War II, through which they made huge financial gains by trading in armaments, and paved the way for the establishment of their state. It was they who instigated the replacement of the League of Nations with the United Nations and the Security Council to enable them to rule the world through them. There is no war going on anywhere, without having their finger in it. (Article 22)

Israel, Judaism and Jews challenge Islam and the Moslem people. "May the cowards never sleep (Article 28)

The Zionist plan is limitless. After Palestine, the Zionists aspire to expand...they will aspire to further expansion, and so on. Their plan is embodied in the "Protocols of the Elders of Zion" Leaving the circle of struggle with Zionism is high treason, and cursed be he who does that. (Article 32)

Moslems and Islamic civilization...should back and support it [Hamas], as Allah wants them to, extending to it more and more funds till Allah's purpose is achieved when ranks will close up, fighters join other fighters and masses everywhere in the Islamic world will come forward in response to the call of duty while loudly proclaiming: Hail to Jihad. Their cry will reach the heavens and will go on being resounded until liberation is achieved, the invaders vanquished and Allah's victory comes about. (Article 33)

94.     HAMAS achieves its stated goals through both a military and a social wing.   The

military wing, Izz el-Din al-Qassam Brigades, carries out suicide bombings and other murderous

attacks within Israel, the West Bank and Gaza.   These attacks target civilians and have resulted in

deaths and injuries to thousands of civilian men, women and children including Plaintiffs in this

action.  The social wing is necessary for indoctrination and recruitment as well as funding for the

military wing.

95.     As the Israeli Supreme Court noted in its opinion regarding the appeal of Sheikh Ra'ed

Salah:

> "The modus operandi of the organization [known as] HAMAS, as described by
> professional opinion and [demonstrated by] the evidence, shows that its civilian activities
> provide an infrastructure for its terrorist activities by supporting, reinforcing and
> encouraging them…transferring funds to support the families of suicide bombers and
> security detainees can certainly be considered an incentive and encouragement for the
> perpetrating of lethal terrorist attacks and has nothing in common with ordinary religious
> bequests to contribute to the welfare of the needy and indigent, which the complainant
> [Sheikh Ra'ed Salah] and his representatives would like to use to camouflage their
> actions. (Sheikh Ra'ed Bin Salah) *[Excerpt from translated portion of Mahajneh v. State
> of Israel*, Supreme Court of Israel, Case No. 7223/03, p. 7, paragraph. 5 (August 18,
> 2003)].

96.     Christopher D. Hamilton, an expert on HAMAS and Middle East terrorism and

counterterrorism, has explained that HAMAS's attacks are indiscriminate in nature and are

intended to terrorize the general Israeli population, including the surviving relatives and friends

of the direct victims of attacks.  In planning these attacks, HAMAS purposefully targets heavily

populated places such as buses, bus stops, restaurants, markets, discotheques, and universities.

See, *Sisso v. Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 48627 (D.D.C. July 5, 2007).

97.     In 1995, the U.S. government designated HAMAS a "Specially Designated Terrorist"

entity, at which time any of its assets subject to U.S. jurisdiction were blocked by E.O. 12947

and implementing regulations.  The E.O. prohibits transactions, including financial transactions,

with organizations and individuals so designated.  Former HAMAS Political Bureau Chief and current Deputy Chief Mousa Abu Marzook was designated a Specifically Designated Terrorist by the U.S. Secretary of State on August 29, 1995.

98.    On October 8, 1997, the US Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to 8 U.S.C. §1189, by publication in the Federal Register.  As of that date it became unlawful to provide material support and resources, including currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of HAMAS.

99.    The designation of HAMAS was a public event and well known to the entire international community, including Defendants.

100.    Hamas publicly continues to endorse and advocate the jihad and martyrdom in connection with attacks against Israel and the US, as is evident from its recent condemnation of the American killing of Osama bin Laden.    Ismail Haniya, head of the de facto Hamas administration in the Gaza Strip, told media correspondents that "we most definitely condemn the killing of an Arab Muslim jihad fighter [*mujahed*], and we pray to Allah to cover him with mercy along with the prophets, the righteous and the shaheeds." (Hamas' daily Felesteen, May 2, 2011).

## AL-AQSA MARTYRS BRIGADE

101.    The Al-Aqsa Martyrs Brigade a/k/a/ Al-Aqsa Martyrs Battalion ("AAMB") is a terrorist organization based in the West Bank and Gaza Strip, formed and controlled by al Fatah, a former terrorist organization established by Yasser Arafat, which purportedly renounced terrorism, and today is a political party within the Palestinian National Authority.  The AAMB is the armed wing of Fatah.  In an interview for USA Today, conducted on March 14, 2002, Masalma Thabet, leader of the AAMB in Tulkarm, stated that *"our group is an internal part of Fatah."* He further stated that *"the truth*

*is, we are Fatah itself, but we don't operate under the name of Fatah. We are the armed wing of the organization. We receive our instructions from Fatah. Our commander is Yasser Arafat himself."*

102.    Since its establishment, the AAMB has committed numerous attacks in Israel, the Gaza Strip and the West Bank in which hundreds of civilians were killed and wounded, including citizens and nationals of the United States.

103.    The AAMB has openly adhered to a mission to destroy, topple and eradicate the State of Israel and Jews living in Israel and replace it with an Islamic and/or Arab Palestinian State and uses violent means to achieve its goal.

104.    On September 23, 2001 the US Department of State designated the AAMB as a foreign terrorist organization and on October 31, 2001 as a Specially Designated Terrorist Entity. Subsequently, on March 27, 2002, pursuant to the authority of section 1(b) of Executive Order 13224 (of September 23, 2001), the Deputy Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determined that AAMB had committed, or posed a serious risk of committing acts of violence that had the purpose or effect of disrupting the Middle East Peace Process and designated AAMB as a Specially Designated Global Terrorist ("SDGT").

105.    The Al Aqsa Martyrs Brigades is organized into local cells, which have conducted shooting and other attacks and suicide bombings against civilians in Israel and the West Bank.

106.    Since September 2000 AAMB has conducted and taken responsibility for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred others.

107.    While not the most publicized of Palestinian terror organizations, the AAMB has organized some of the most gruesome terrorist attacks in Israel, especially during the escalation of violence commencing in 2001, when the AAMB increased the level of its cooperation with

other terrorist organizations, including Hamas and PIJ. A number of bombings and shootings were perpetrated by the AAMB, individually or in partnership with other terrorist groups.

108.     AAMB has acknowledged responsibility for terrorist attacks, including shooting attacks, ambushes and suicide bombings, which employed new techniques, such as deploying the first female suicide bomber.

109.     The AAMB has also recruited 15-year-old boys to carry out suicide bombing attacks. AAMB, like Hamas and PIJ, promised suicide bombers that payments would be made to their families after the attacks were conducted, in part in reliance upon the funds provided by Iran and Syria and committees set up specifically for this purpose. Such promises have fueled and incentivized youth to continue to commit such suicide attacks.

110.     During Operation Defensive Shield it was discovered that Munir Hussein Khalil Al-Maqdah ("Maqdah"), leader of the Fatah faction had transferred large sums of money to support Fatah/Tanzim/AAMB terrorists in various West Bank areas. According to a mainstream Fatah official, Maqdah "*has very good ties with Syria and Iran. These countries pay him millions of dollars,*" which is used to fund terror attacks.

111.     A Palestinian Authority General Intelligence document, seized by the IDF in Jenin, also demonstrates that Fatah and the PA security apparatuses in Jenin continually cooperate with the other terrorist organizations such as the PIJ by supplying them with weapons, executing joint large scale terror attacks in Israel (i.e. Afula in 11/27/2001) and providing early warnings with regards to the Palestinian Authority's intentions to act against them.

112.     According to claims by Hamas, PIJ and AAMB, a number of terrorist attacks and Qassam rocket launches into Israel have been carried out jointly by two or more organizations acting together.

113.    The financing for most of the terror attacks by AAMB comes from either Iran through Hezbollah or from funds received from the PIJ, who also provide aid to Fatah families of activists killed.

## PALESTINIAN ISLAMIC JIHAD

114.    The Palestinian Islamic Jihad – Shiqaqi Faction (a/k/a Palestinian Jihad) ("PIJ") is an international terrorist organization with "cells" or units located throughout the world.  PIJ is also known as "the Islamic Movement in Palestine," "The Movement," and "The Family."

115.    In January 1995, PIJ was designated as a Specially Designated Terrorist Entity ("SDT") by the U.S. Department of Treasury pursuant to Executive Order 12947 prohibiting transactions with groups that threaten to disrupt the Middle East peace process.

116.    On October 8, 1997, PIJ was designated a Foreign Terrorist Organization ("FTO") by the U.S. Secretary of State pursuant to 8 U.S.C. §1189.  By publication in the Federal Register, it became unlawful to provide material support and resources, to include currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of PIJ.  The European Union has also designated the PIJ as a terrorist organization.

117.    The PIJ organization is virtually entirely dependent upon Syria and Iran. Syria permits its command to operate openly from its headquarters in Damascus and Iran is the organization's primary sponsor. PIJ's budget is almost entirely funded by Iran.

118.    The Palestinian Islamic Jihad movement was established during the 1970's by a group of Palestinian students in northern Egypt, headed by Fatkhi Abd al-Aziz Shkaki. The founding members of PIJ had originally belonged to the al Fatah organization (headed by Yasser Arafat) and to the Muslim Brotherhood in Egypt. Their aim was to copy the jihad movements that were

flourishing in Egypt at that time and create a Palestinian Islamic movement that would be an alternative to the secular nationalism of the Fatah/PLO.

119.   The PIJ emulated the Shi`ite (a/k/a Shi`i, Shia Islam, Shi'a Islam, Shii Islam) radical ideology of the Ayatollah Khomeini. According to a US State Department report (see Patterns of Global Terrorism-1994), "PIJ is committed to the creation of an Islamic Palestinian state and the destruction of Israel through holy war." In addition, PIJ views terrorist attacks against Israel as the only means for achieving its goals and categorically rejects any notion of peace negotiations.

120.   Despite being relatively small compared to Hamas and the Fatah, PIJ is an organization with significant terror capabilities. Since the early 1990's, this organization carried out, dozens of terrorist attacks in which hundreds of Israeli civilians were killed and injured.

121.   PIJ drafted "Manifesto of the Islamic Jihad in Palestine," a document describing its organizational structure, goals and principles. The PIJ Manifesto postulates creation of a violent movement and society based upon inflexible principles grounded in radical Islamism and espouses jihad (holy war) in order to first ethnically cleanse Palestine of Jews and eventually convert the entire world to its version of Islam. The tactics of PIJ include terrorism to induce barriers between Muslims and Jews, making coexistence impossible and resulting in the "re-groupment" of the Jews. The manifesto is widely distributed throughout the Palestinian territories, Jordan, the Middle East and the entire world.

122.   The manifesto states (in part) that:

> The Islamic Jihad Movement in Palestine is a revolutionary `Jihad` movement embracing Islam as Religion and State (Form of Government). It is the vanguard of the Islamic Revolutionary Movement. (Definition)

> Jihad is the solution to liberate Palestine and topple the infidel regimes. (Characteristics – 2)

Our education (is) practical and (based on) Jihad through an educational system for the youth (Principles – 3)

The universality of the conflict as a struggle against the atheism and the oppression triangle: the West, the (Arab) regimes and Israel (Political Constants – 2)

The rejection of any peaceful solution for the Palestinian Cause, and the affirmation of the Jihad Solution and the Martyrdom style as the only choices for liberation (Political Constants – 4)

The liberation of the Holy Land from the Zionist occupation (General Goals – 4)
The creation of a situation of terror, instability and panic in the souls (minds) of Zionists and especially the groups of settlers, and force them to leave their houses. (Specific Goals – 2)

Martyrdom awards life (Slogans of the Movement - 6)


## IRAN AND ITS TIES TO TERRORISM (AGAINST THE U.S., WEST AND ISRAEL)

123.    The Islamic Republic of Iran ("Iran") is a foreign state which at all times alleged hereinafter was designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405 (j)), § 620A of the Foreign Assistance Act, 22 U.S.C. § 2371; and § 40(d) of the Arms Export Control Act, 22 U.S.C. § 2780(d).

124.    Support for terrorism is an official state policy of the Iranian regime.  Since the Islamic Revolution in 1979, Iran has become notorious for its radical foreign policies, including engaging in terrorism.  Iran is the foremost nation in promoting, endorsing and employing terror to achieve its objectives. Iran's involvement in terrorism, which it refers to as "*Exporting the Revolution,*" has been instrumental in providing weapons and training to other terrorist organizations and surrogates in various countries, in order to further their causes.

125.    Iran has a nine-figure line item in its budget to support terrorism, sending hundreds of millions of dollars to various groups each year. U.S. officials have described the Iranian regime as the world's "central banker of terrorism."  Iranian security and terror apparatuses have

perpetrated hundreds of terror attacks throughout the world, largely aimed at U.S. and Israeli citizens.[10]

126.    As a pattern of its worldwide terror, Iran has perpetrated some devastating attacks against US and Western targets.  Iran sponsors and hosts numerous conferences involving terrorist organizations.

127.    According to testimony given by Daniel Glazer, Treasury Deputy Assistant Secretary for Terrorist Financing and Financial Crimes  before the House of Representatives Committee on Foreign Affairs on April 17, 2008:

> The threat we face from Iran is not limited to its pursuit of nuclear capability.  Another dynamic of Iran's threat is its provision of financial and material support to terrorist groups.  Iran has long been a state sponsor of terrorism and continues to support an unparalleled range of terrorist activities.  For example, Iran arms, funds and advises Hizballah, an organization that has killed more Americans than any other terrorist network, except for al-Qa'ida, and does so via the Qods Force, a branch of the Islamic Revolutionary Guards Corp.  In addition, Iran provides extensive support to Palestinian terrorist organizations, including Palestinian Islamic Jihad and Hamas.  In the case of PIJ, Iran's financial support has been contingent upon the group's carrying out attacks against Israel.  And we are all familiar with Iran's funding, training and equipping select Shi'a extremist groups in Iraq, further destabilizing that country, and resulting in the deaths of Americans, Iraqis and others. Iran's Qods Force also provides weapons and financial support to the Taliban to support anti-US and anti-Coalition activity in Afghanistan. Iran utilizes the international financial system as a vehicle to fund these terrorist organizations…the Iranian regime operates as the central banker of terrorism, spending hundreds of millions of dollars each year to fund terrorism.

128.    Iran's terror activity is not an act of one man alone but requires the approval of the decision-makers in the Iranian government - the Supreme National Security Council, which includes the Supreme Leader Ali Khamenei as well the IRGC and the Iranian Ministry of Information and Security ("MOIS") which has been found to be directly involved in directing and approving operational echelons and chosen targets.

129.    More than a military branch of Iran, the IRGC is the dominant force within the ruling establishment in Tehran today having evolved to permeate all aspects of the state, including

political, economic and cultural aspects of Iran. The IRGC, which was formally created by decree in December 4, 1979, by the Supreme Leader Ayatollah Ruhollah Khomeini, has been linked to international and local terror activity since 1982.[11] The U.S. State Department has noted that the IRGC provides support for HAMAS, Hezbollah, and Islamic Jihad in Israel.

130. The IRGC has been involved in terror attacks inside Lebanon and against Western targets, Israel and terror attacks worldwide on behalf of Iran.

131. The IRGC is also a business conglomerate that controls over 500 companies spanning a wide range of industries, including nuclear power, banking, insurance, retail, shipping, and airlines. By most estimates the IRGC is Iran's third largest corporation.

132. Economically, the annual turnover of IRGC business is estimated at $12 billion with total net profits of $1.9 billion. Almost all of the public sector companies marked for privatization are expected to end up in the hands of the IRGC and its individual commanders.[12] Quoting former US Treasury Secretary Henry Paulson, "It is increasingly likely that if you are doing business with Iran you are doing business with the IRGC."

133. The U.S. Treasury has designated numerous Iranian companies under E.O. 13382 based on the fact that these entities are owned or controlled by the IRGC and its leaders. Treasury Under-Secretary for Terrorism and Financial Intelligence, Stuart Levey, testified, in written testimony before the Senate Foreign Relations Committee on June 22, 2010, "*We also designated the IRGC's Qods force, the branch of the Revolutionary Guards that has provided material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and others. Last week we supplemented these actions by designating additional branches of the IRGC...In addition, we designated Mohammad Ali Jafari, the Commander-in-Chief of the IRGC...With*

---

[11] In addition to Qouds, the IRGC is made up of four additional branches: Ground Forces, Air Force, Navy and Basij militia.

*these actions, we have now designated 26 entities and individuals connected to the IRGC for sanctions...We intend to continue to focus on the IRGC as an important part of our strategy to hold Iran accountable for its actions because of the central role that the organization plays in Iran's most reprehensible and illicit conduct. In addition to playing a key part in Iran's missile and nuclear programs and providing support for terrorism... "*

134.    These designations pursuant to E.O 13382 affirm that the IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors which it uses for illicit purposes, including funding terrorism. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. IRGC officers have been appointed as governors of twenty of Iran's thirty provinces.

135.    The IRGC finances Hezbollah branches in 20 countries and provides money, arms and training for radical groups including Hamas, PIJ and AAMB directly or indirectly through Quds Force and/or Hezbollah. IRGC is the primary financier and supporter of HAMAS, PIJ and AAMB, as well as of other terrorist groups targeting American citizens in Iraq, Yemen, Afghanistan and Pakistan.

136.    Iran's terrorist training bases are operated by the IRGC, primarily through its Qods force. Qods is one of five branches of the IRGC, the strongest military-security body in Iran and the regime's main support. Qods activities range from establishing educational systems for indoctrination and civilian infrastructures supporting Iran and its radical ideology to operating armed terrorist and guerilla cells and acting to subvert secular, pro-Western Arab-Muslim regimes.

---

[12] The Middle East Quarterly: The Revolutionary Guards' Role in Iranian Politics; Ali Alfoneh, Fall 2008, pp. 3-14

137.   Qods has provided training in the use of explosives, improvised explosive devices ("IED's") firearms, sophisticated weapons such as Katyusha rockets and Strela antiaircraft missiles, assassinations, espionage, clandestine communication and kidnapping to terrorist organizations, including HAMAS, PIJ and Hezbollah, who act in concert with the AAMB. Qods is also responsible for waging indirect war against the U.S. and allied forces in Iraq and Afghanistan.   Currently, assistance and training to these terrorist organizations is conducted through Qods, which operates abroad, including in camps in Lebanon and Sudan.   The IRGC in Lebanon actively recruits Palestinians to fight Israel.

138.   Iran has provided and continues to provide substantial, systematic, financial and military support to Palestinian terrorist organizations in the form of money, weapons, explosives, training, sanctuary, documentation, intelligence, and other types of assistance.   Specifically, this support is provided to designated terrorist organizations such as Hezbollah, HAMAS and the Palestinian Islamic Jihad. The aid provided by the Iranian regime to these organizations comes simultaneously with this regime's repeated and declared agenda to "wipe the State of Israel off the map."

## IRAN AND ITS TIES TO HAMAS, PIJ AND AAMB

139.   The ties that bind Iran and HAMAS are evident.   Since the early 1990's through the time of the attacks herein and continuing until the present, the alliance has not only been on the political and financial level, but also on the military level where Iran has actively commenced training HAMAS "military activists."

140.   As early as October 1990, HAMAS had an official representative in Tehran[13]. In February 1992, HAMAS established a permanent structure in the Iranian capital from which it could actively recruit new members.   Since its establishment in Tehran, HAMAS received military,

financial, political and ideological support from Iran through the IRGC, Qods and MOIS. MOIS was largely responsible for liaising with HAMAS and coordinating relations between the two. *Stern v. Islamic Republic of Iran,* 281 F.Supp. 2d 258 (D.D.C. 2003). The U.S. State Department concluded that Iran "has used its intelligence services extensively to facilitate and conduct terrorist attacks." *Sisso v. Islamic Republic of Iran,* 2007 U.S. Dist. LEXIS 48627 (D.D.C. July 5, 2007).

141.    Iran has provided HAMAS with hundreds of millions of dollars, weapons, explosives, terrorism training and other assistance through numerous instrumentalities and agents such as the MOIS, IRGC, Hezbollah, and its agents in Lebanon. Iranian aid to HAMAS has facilitated HAMAS's capabilities in developing and committing terrorist attacks. Without such far-reaching Iranian support, HAMAS would not have been capable of perpetrating the majority of terrorists attacks launched against civilian targets in Israel and in other countries.

142.    In 1992 and 1993, the Arab media began tracking and reporting the aid Iran provided to HAMAS and other charities. *Al Wasat* published an article about the establishment of HAMAS. The article raised the following question, *"Has HAMAS become the military branch of Iran and the gate through which the Iranian revolution tries to enter the West Bank, Gaza and the Palestinian arena in general?"* The article quoted several Palestinian, Arab and European sources who stated that relations between Iran and HAMAS were upgraded in October 1992 when HAMAS leaders, Musa Abu Marzouk and Ibrahim Ghosheh, met with Iranian leaders, the Supreme Leader Ayatollah Ali Khamenei and the IRGC Commander, and forged an alliance. The agreement provided that (1) both Iran and HAMAS would firmly object to the peace process, (2) that Iran would allow HAMAS to open a representation office in Tehran, (3) that Iran would provide HAMAS with annual financial support of $30 million USD and (4) that 3,000 HAMAS

---

[13] Iran's capital.

"activists" would be trained in Iran and Hezbollah's military compounds in Lebanon. Further, Imad al 'Alami, former HAMAS representative in Tehran, declared, in early 1993, that HAMAS considered Iran a strategic ally.

143.    Defendant Iranian Supreme Leader Ayatollah Ali Khamenei, along with others in the Iranian leadership named in this Complaint, continuously reiterate in Islamic and international forums the legitimacy of Palestinian terror and provide venues for conferences that support their continuation. On October 31, 1991, Iran hosted the International Conference for the Support of Muslim Palestinian People's Revolution, which was attended by both Islamic and secular Palestinian groups. The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities.   In doing so, Iran tightened its ties to the radical groups HAMAS and PIJ. From 2000 to 2006, Iran continued hosting annual meetings of the Palestinian terrorist organizations under the slogan *"The International Conference for the Support of the Palestinian Intifada."* Senior HAMAS and Iranian leaders collaborated about coordinating the activities of the terrorist organizations and recommended they commit more attacks.  HAMAS used the conferences to declare its policy of rejecting peace negotiations in favor of jihad. For example  at a 2001 conference, Khaled Mish'al, chairman of the HAMAS "political" bureau, said *"The attempts to reach peace failed and hence all means to liberate Palestine, including jihad, are justified."*

144.    A February 6, 2004, USA Congressional report noted that HAMAS received financial aid from Iran, which according to some estimation, was ten percent of HAMAS' annual budget. *Mousa v. The Islamic Republic of Iran,* 238 F.Supp. 2d 1 (D.C. 2001), where it was estimated that Iran's support of HAMAS terrorist and other activities range between $50-100 million per year). HAMAS has acknowledged receiving financial support from Iran in the amount of

$15,000,000 per month. The funds were used to support both terrorism and a broad range of welfare activities. *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000).

145.   Supreme "religious" leader, Ayatollah Khamenei and President Ahmadinejad have publicly praised Palestinian terrorist operations, and Iran provided Palestinian terrorist groups – among them, PIJ, HAMAS, Fatah/AAMB and Hezbollah with extensive funding, training and weapons.

146.   Defendant Ayatollah Khamenei publicly proclaimed: "*...we regard Palestine as an organ of our body, and the support of the Palestinian nation is pride for the Iranian people...The Palestinian people must continue the blessed Jihad* [holy war] *and its standing against the enemies of Islam... **The Hamas, Islamic Jihad and Fatah** forces must continue the struggle in a united way... But, indeed, the only solution [to the crisis in the region] is the elimination of the root of this crisis, which is the Zionist regime imposed on the region.*" (Khabar TV, Iran, 20 October 2000).

147.   Amongst the Palestinian terrorist organizations, PIJ is the most loyal and the most connected to Iran, to such an extent that the relations between Iran and PIJ are described as a `Patronage Relationship.`[14]

148.   According to research conducted by Yehudit Barsky the director of the American Jewish Committee's Division on Middle East and International Terrorism and an associate scholar at the Foreign Policy Research Institute's Middle East Council, "From its earliest days as a movement, the PIJ has closely linked itself to Iran. Iran's association with Islamic Jihad has ranged from providing ideological inspiration and moral support to logistical and financial assistance

---

[14] See: http://www.terrorism-info.org.il/malam_multimedia/html/final/eng/bu/iran/chapt_c.htm

throughout the movement's existence. In 1988, PIJ leaders al-Shiqaqi and al-'Awda[15] established the headquarters of the PIJ in Beirut, Lebanon, with the assistance of the Iranian Embassy and leaders of Hizballah, the Shi'i terror movement of Lebanon."

149.    In a 1993 report of *Newsday*, Fathi Shiqaqi, then the secretary general of PIJ, acknowledged that he received Iranian funding and channeled it to operatives in Gaza and the West Bank. Al-Shiqaqi said: "Iran gives us money and supports us. Then we supply the money and arms to the occupied territories and support the families of our people. Just about all of it goes there because that's where most of our organization is."

150.    After the outbreak of the first Intifada (December 1987), PIJ financial dependence on Iran grew significantly. According to a January 1993 article published in the Lebanese weekly Al-Shir'a[16], until the year 1988 PIJ financed itself primarily by selling magazines and from Zakat monies, but right after the first Intifada broke, Iran became the main financer of this organization.

151.    According to official sources, Iran is the primary, or even the exclusive financier of PIJ. The organization's annual budget has been estimated at several million dollars, a large percentage of which is used for funding terrorists' attacks against Israel. According to the testimony of Treasury Under-Secretary Stuart Levey before the Senate Committee on Banking: *"In the case of PIJ, Iran's financial support has been contingent upon the terrorist group carrying out attacks against Israel."*

152.    After the outbreak of the second Intifada in September 2000 ("Al-Aqsa Intifada"), the Iranian involvement in the Palestinian territories intensified. Meetings between Iranian high-

---

[15]  Sheikh Abd al-Aziz 'Awda, a religious Islamic preacher from the refugee camp in Gaza strip, was one of PIJ founders.
[16]  Al-Shir'a magazine is affiliated with the Shi'i circles in Lebanon.

ranking officials and PIJ leaders were held in Iran and in Damascus on a regular basis[17]. In these meetings, Iran not only promised to provide financial support for Hamas and PIJ, but also urged these organizations to carry out suicide attacks.

153.    Ramadan Abdullah Shalah (Sallah), the leader of PIJ, met with Iranian spiritual leader the Ayatollah Ali Khamenei in April 2001. Khamenei promised to increase the organization's funding by approximately 70 percent, in order to finance the costs of recruiting young Palestinians for suicide attacks. At this meeting Khamenei praised the "heroic acts" by the members of the organization, in particular the suicide bombers and stressed that Iran would provide PIJ with funding and weapons that would enable the organization to continue its suicide attacks.

154.    The issue of Iranian support for PIJ has already been recognized in this Court.  For example, in 1998, in connection with the killing of Aliza Flatow by PIJ terrorists, U.S. District Court Judge Royce Lamberth found: *"The sole source of funding of PIJ was the Islamic Republic of Iran. Iran provided material support and resources to PIJ, by supplying funds and trainings for PIJ activists. The Iranian Ministry of Information and Security acted as a conduit for the Islamic Republic of Iran provision of funds and training to PIJ for its terrorist activities."* Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998)

155.    For each successful suicide attack against Israel, Iran provides PIJ special "bonuses." In this manner, there is no question that Iran has intensified its influence over the organization and encourages additional terrorist attacks.

---

[17] Every year the Iranian regime hosts a summit conference which includes representatives from various terror organizations. Khaled Mash'al, Ramadan Shalah, Hasan Nasrallah - are all permanent participants in this conference. These annual meetings are considered to be coordination meetings between the Iranian regime and these terrorist organizations.

156.   In addition to money, the Iranian regime supports PIJ on all levels, beginning with political and ideological support and ending with military training, explosives, weapons and ammunition.

157.   While the Iran-PIJ relations reflect the maximum degree of direct patronage, Iran's relationship with AAMB is more indirect, with Hezbollah largely serving as the intermediary.

158.   Hassan Nasrallah, Hezbollah's secretary general, publicly admitted that there was a faction in Hezbollah active in providing operational support for the Palestinian operatives,[18] after which, Fatah/AAMB leaders publicly admitted that they had received support from Iran and Hezbollah, including financial support.

159.   Other high-ranking Fatah/AAMB operatives have also made public the support they receive from Iran and Hezbollah. Jibril Rajoub, previous director of the PA preventative Security has noted that Iranian financial support has been transferred via Hezbollah to escalate violence. Abu Mujahid, a senior operative of AAMB in Nablus, said: *"We do not hide the fact that some active operatives of our organization are financed and encouraged by interested parties, from senior Palestinians who finance operations to inflame the situation to operatives who are financed by Hezbollah and Iran. Both work to promote their own personal interests and those of their supporters, interests contrary to the good of the Palestinian people. But the Brigades (AAMB), the real activists, are part of Fatah and are not an armed band working for one group or another"*[19]

---

[18]   Al Manar TV, July 19th 2004
[19]   An interview with Ynet News, August 3rd 2004

160.   At least two suicide attacks committed by Fatah/AAMB members from Nablus were financed by Iran and Hezbollah: the Tel Aviv Bus Station [January 5th 2003, 22 dead] and the Kfar Saba railway station [April 24th 2003, 1 dead][20]

161.   According to a mainstream Fatah official, Maqdah *"has very good ties with Syria and Iran. These countries pay him millions of dollars. He is using the money to undermine the local Fatah leadership and establish his own bases of power here."* Press reports have also claimed that Iran has traditionally funded Palestinian dissident groups in the Lebanese refugee camps, including Maqdah, through the *Institute of the Palestinian Martyrs* (a/k/a the Shahid, Martyrs Fund) which helps the families of war casualties, including Palestinians and the Hezbollah. [21]

162.   During the second Palestinian uprising, ex-PLO Colonel and Fatah leader Munir Maqdah Al-Maqdah ("Maqda") began to finance, partially, the terror cells of Nasser Aweis, the commander of Al-Aqsa Martyrs Brigades in the West Bank. Nasser Aweis was involved in a series of murderous terrorist attacks in Israel, in which dozens of Israelis were killed and wounded, including the terrorist attack in the banquet hall in Hadera (17 January 2002 during a bar mitzvah celebration), a shooting attack in Jerusalem and a shooting attack in Netanya (9 March 2002). After his arrest, Nasser Aweis revealed that Maqdah transferred large sums of money to support Fatah/Tanzim/AAMB terrorists in various West Bank areas with monies he received from Iran.

163.   Jamal Mustafa Huweil, arrested during operation Defensive Shield was the treasurer of the AAMB - Jenin area. Huweil described the ties between AAMB-Jenin and Maqdah, including the receipt of financial aid from Maqdah, approximately $5000, transferred every month or two

---

[20] See Malam brief: http://www.terrorism-info.org.il/malam_multimedia/html/final/eng/bu/iran/chapt_c.htm
[21] The bonyad-e Shahid a/k/a the Martyr's Foundation is a front organization based in Lebanon. Since 1995 it has allegedly raised  substantial funding to terrorist organization such as Hezbollah, likely in excess of $100 million annually

to the account of Nasser Aweis from Nablus. Jamal Huweil stated that he was in direct contact with Maqdah and would report to him about terrorist attacks carried out by the AAMB in the Jenin area. In this context, he reported about the suicide attack in Afula (27 November 2001) carried out jointly with PIJ, an attempted attack in Haifa and other attacks carried out in Jerusalem and Hadera.

164.    The arrest of three brothers, Fadi Nazmi Hamdi Abdu a key Fatah/Tanzim/AAMB operative and Hamdi and Shadi Abdu in 2003, shed further light on the extensive financial assistance extended by the IRGC and Hezbollah to support Fatah terrorist infrastructures across the Northern West Bank. Funds that were transferred through Jordan by these three brothers totaling approximately NIS 1,000,000 (approximately US $300,000) were used to finance terrorist activities. A portion of these funds served as a direct source of funding for a terrorist attack at the Kfar Saba railway station. (April 2003).

165.    In his interrogation, Fadi Nazmi Hamdi also described his contacts with a Fatah activist named Fouad Balbisi, from Amman, Jordan. Balbisi acted as coordinator between Fatah and Iran, funneling funds via Hezbollah bank accounts in Beirut.

166.    Fuad Shubaki, a senior consultant and money-man for Yasser Arafat and head finance for the Palestinian Authority General Security Service stated during interrogation after his arrest by the IDF, that the IRGC and Hezbollah helped finance and guided the smuggling attempt by the infamous Karine A (ship seized by Israel loaded with weapons), and that Iran, Hezbollah and the PFLP-GC had contributed the 50 tons of war material on board.

167.    According to media accounts Iranian experts from the IRGC in Lebanon have instructed Palestinians from the Fatah and Hamas in the use of individual SA-7 (Strela) shoulder launched ground-to-air missiles. For example, a course was conducted at the Janta Base in the Bekaa

valley in Lebanon. Twenty Palestinians from the Fatah and HAMAS organizations took part, after having participated the previous year in a basic military course given by the IRGC in Lebanon. Upon completion of the course, the graduates underwent a special training course in Iran, near the city of Qom, and from there returned to the Palestinian territories. Chief operatives of the IRGC were closely involved in this matter, including the coordinating member of the IRGC, Ali Reza Hamiz, and the liaison officer, Munir Maqdah, leader of Fatah, operating in the Ayn Al Hilwah refugee camp near Sidon.

168.    Defendants Ayatollah Ali Khamenei, Presidents Mahmud Ahmedinejad and Ali Akbar Hashemi Rafsanjani have been and continue to be directly involved in terror attacks, are the lead forces within the Iranian government/regime responsible for providing the rhetoric, incitement, encouragement, financing, assistance and direct approval of terrorist attacks directed at civilians in Israel.

169.    Iran's press and media systematically encourage the continuation of the Intifada and glorify violent action and suicide attacks against citizens, residents and visitors in Israel. Through public statements issued by government representatives, spokesman and officers, religious leaders, using mass communications under their control, they continuously advocate slogans such as *"Death to America – Death to Israel*," encourage, solicit, facilitate and incite the use of violence and terrorism against civilians in Israel, Gaza and the West Bank as well as Americans (civilians and soldiers) in Iraq and Afghanistan.[22] At weekly prayer meetings carried on Iranian television and reported in the Iranian press, the clerics encourage and commend terrorist action as important to its worldwide cause. A supreme example is Iran's annual celebration of World Jerusalem Day, a national holiday dedicated to the vision of annihilating the

state of Israel. The key note speech by Mahmud Ahmedinejad is always anti-Semitic, anti-Israel and anti-America. The following is a translated except of President Ahmadinejad's September 2009 speech at this national holiday: *"If war breaks out in Iraq we believe Zionism incited it, and the same is true for war in Afghanistan…If there is oppression in Sudan it is also the work of Zionism… The Zionist Regime is like a rotting tree in every respect- its roots, trunk and leaves are all regimes, cruelty and corruption in they don't let go…"* Iran President: Israel "Will Soon be Wiped Out" In Iran, president Mahmoud Ahmadinejad has renewed his previous calls for Israel's elimination.

170.    In a memo sent to Arafat, on 31 October 2001, Jibril Rajub, then the director of the PA Preventive Security, mentioned a meeting had taken place in Damascus between leaders of terrorist organizations including PIJ, PFLP[23] and Hezbollah noting that Iranian financial support had been transferred via Hezbollah in order to escalate violence.

171.    Official reports of the Israeli Foreign Ministry note that tens of millions of dollars have been transferred annually by Iran to the Palestinian terrorist organizations, including HAMAS, PIJ and the AAMB (largely through Hezbollah), which have ultimately enhanced the terrorist's capabilities and encouraged them to carry out more attacks

172.    Iran's support of HAMAS, PIJ and the AAMB comes from monies and other direct and indirect means of assistance.  Plaintiffs allege that the financial support HAMAS, PIJ and the AAMB receives from Iran comes from monies and other support Iran receives from its highly lucrative government owned and controlled businesses such as the National Iranian Oil

---

[22]An example of one of many of Ahmadinejad's anti-Israel quotes in December 2006: "I want to tell them (western counties) just as the Soviet Union was wiped out and today does not exist, so will the Zionist regime soon be wiped out."

[23] It is possible that the "PFLP" to which the document refers is actually the "PFLP-GC", headed by Ahmad Jibril.

Company, the National Petrochemical Company, Iran Air, IRISIL, Bank Melli, Bank Sederat and Bank Sepah.

173.   Not coincidentally, involvement by the IRGC has significantly increased in the Iranian oil, gas and energy sectors.  These Iranian owned and operated oil and gas companies are so involved in numerous lucrative ventures with the IRGC that, since 2005, the IRGC controls de facto the biggest oil deals.

174.   These high profile Iranian owned and operated petroleum companies are clearly agents and instrumentalities of Iran.  They are controlled by the IRGC and monies obtained by these companies are utilized both directly and indirectly to fund HAMAS, PIJ and the AAMB and other terrorist organizations.

175.   The NIOC (National Iranian Oil Company) and its affiliates have been listed, pursuant to the Iranian Transactions Regulations-31 C.F.R. Part 560, as companies with which US companies are prohibited from transacting business.

176.   Iran also utilizes its banking institutions to finance and facilitate assistance to terrorist organizations such as HAMAS, PIJ, Hezbollah and AAMB, including the Bank Melli of Iran (a/k/a the National Bank of Iran), Bank Saderat of Iran and Bank Sepah, all of which are owned and directly controlled by Ayatollah Khamenei, Iranian President Mahmoud  Ahmadinejad, and/or the IRGC and all of which have been designated by the US as sanctioned companies with whom US companies are prohibited from transacting business.  *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406 (1995).

177.   A fact sheet released by the U.S. Treasury Department also asserts that, between 2002 and 2006, Bank Melli sent at least $100 million to HAMAS, PIJ, and other terrorist groups, via Al Qods Force.

## SYRIA AND ITS TIES TO TERRORISM

178.    Syria has been designated by the U.S. State Department as a foreign state sponsor of terrorism, pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405 (j)), signed December 29, 1979.

179.    Syria has provided continuous training, weapons, explosives, funding, safe haven and logistical support to HAMAS. PIJ and AAMB. In the 1990s, HAMAS and PIJ depended primarily on Syria for military and financial means as well as for its base of operations. Official State Damascus Radio reported on January 1, 2002, that "Syria has turned its land into a training camp, a safe haven and an arms depot for the Palestinian revolutionaries."

180.    Continuously since the late 1960's, the Syrian regime has maintained a strategy of waging a proxy war against Israel through support of the Al Fatah and other Palestinian terrorist organizations.

181.    Syria and Lebanon are said to host the greatest concentration of terrorist training camps in areas directly or indirectly controlled by Syria.  Iran falls closely behind Syria and Lebanon in this regard.

182.    Syria has hosted numerous meetings in connection with discussions of escalating terror activities, largely involving Iran. In 1982 an Iranian military delegation arrived in Syria in order to discuss the ways by which Iran could help Lebanon.  The commander of the IRGC Mohsen Rezaee, who attended the meetings said: "The delegation came to Syria in order to study the problem (in Lebanon) and to fulfill the true principals of Jihad for which our people had waited for many years and for teaching the Zionists a lesson."  As a means of implementing this aspiration, several groups of Iranian volunteers arrived during June 1982 to Damascus.

183.   The Bashar al Assad regime has spoken out publicly in defense of *"martyrdom operations"* and has even influenced state-appointed religious leaders to validate the attacks.  In December 2001, one of the most prominent Islamic leaders in Syria, Mahmoud Akkam of Aleppo, issued a *fatwa* saying that the killing of Israeli civilians was permissible and "even a duty" under Islamic law.

184.   President Bashar Assad and his regime have continued to openly praise the Palestinian terrorist organizations, including HAMAS, PIJ and the AAMB such as the following:  Damascus Radio - Date: 9 May 2002: *"The magnificent and unique suicide operation which some of the Palestinian people sons carried out in Rishon Le-Ziyyon, is a practical declaration to the entire world about the way to liberate Arab Palestinian land from Israeli colonialism."* Al Majd, Jordan, 19 March 2001: *"We seek to support the Intifada which we consider to be a brave struggle phenomenon which must not be abandoned nor should its support be delayed. The Oslo agreement is dead... just as we stood by the Lebanese struggle we will always stand by the Palestinian struggle..."* Al Ahram, Egypt, 16 November 2001, Former Vice President Khaddam: *"We never succeeded to surpass Israel with regard to armament and international aid, and the importance of the resistance is in its use of weapons which Israel does not have - the weapon of the will to resist and the martyr deaths. It has been proven that Israel cannot contend with this weapon."* Al Ra'e Al Aam, Kuwait 25 December 2001: (Former) Foreign Minister Al Shara current Vice President: *"It is possible to balance [implicitly, Israel's military and technological capabilities] by focusing on the enemy's weaknesses... if a person wants to blow himself up, no force can prevent him from doing so ... Syria has given everything to the Intifada."*

## SYRIA's TIES TO HAMAS, PIJ AND AAMB

185.   Syria has supported HAMAS since not long after its inception. Numerous reports, including those of the U.S. State Department, show that the regimes of both Hafez al Assad, Syria's former President, and his son Bashar al Assad, Syria's current President, have provided continuous political, financial, material and military support to HAMAS and enabled HAMAS to operate its political and military apparatus from Damascus, Syria.

186.   Numerous deadly terrorist attacks committed by HAMAS in Israel, the West Bank and the Gaza Strip were orchestrated in Syria. Hundreds of civilians, including U.S. citizens, were killed and thousands were wounded in these attacks. HAMAS leader, Khaled Mashaal, currently resides in Syria. PIJ and HAMAS are headquartered in Damascus. Weapons provided to Hezbollah by Iran regularly pass through Syria with the Syrian government's knowledge and acquiescence. These are the same weapons that are used against Israeli citizens. From their Syrian safe-haven, HAMAS leaders, Khaled Mashal and Mousa Abu Marzouk, whom the US government has designated as Specially Designated Terrorists, Imad al-Alami and others launch terrorist operations against civilians, including the attacks which injured Plaintiffs.

187.   Beginning in 1991, the Hafez al Assad regime in Syria allowed HAMAS to establish offices in the Yarmouk Refugee Camp not far from Damascus. By that time, HAMAS had already been designated as an illegal and terrorist organization by the government of Israel.

188.   The relationship between Syria and HAMAS was strengthened immediately after Israel and the PLO signed the Joint Declaration of Principals in September 1993, which launched the "peace process." President Hafez al Assad then invited HAMAS to join other Syrian-sponsored Palestinian groups in a new Damascus-based anti-peace coalition. In October 1994, the Syrian regime permitted a HAMAS delegation to travel to Lebanon to meet Hezbollah Secretary

General Hassan Nasrallah. Around the same time, Sheikh Izz al-Din Khalil, a senior Izz a-din al Qassam Brigades[24] Commander, established the operational headquarters for the HAMAS military wing in Damascus. Sheikh Khalil, who was among the hundreds of HAMAS members deported from Gaza to South Lebanon in 1992, worked closely in conjunction with Syrian military intelligence. Upon the arrival of Imad al Alami, another senior HAMAS member, in 1995, Damascus became the center of *all* terrorist functions from strategic planning to command and control. (As recently as February 26, 2010 Syrian President Bashar Assad hosted Iranian President Mahmoud Ahmadinejad and Nasrallah for an unprecedented dinner meeting in Damascus).

189.    By 1996, it was well known in the region that the Syrian regime was supporting HAMAS. Specifically, Syria granted HAMAS unrestricted access to Syrian-occupied Lebanon. HAMAS opened an office in Lebanon from which it strengthened its contacts with Hezbollah made contacts with the IRGC and began to recruit in Palestinian refugee camps.

190.    During the mid-1990's, the Syrian regime also permitted new HAMAS recruits to undergo training at Hezbollah and PFLP-GC camps in the Beqaa Valley of eastern Lebanon, an area controlled by the Syrian military. Iranian and Hezbollah instructors in the camps trained hundreds of HAMAS operatives in military tactics, explosives manufacturing, hostage-taking, communications, and intelligence gathering.

191.    In late May 1998, the then HAMAS leader, Sheikh Ahmad Yasin, visited several Middle Eastern countries and cities, including Damascus, in order to raise funds and political support for the terrorist organization. While in Syria, Yasin met with top Syrian officials and in a speech proclaimed that Palestine could be retaken only by "resistance" and jihad and that the [suicide] attacks would not stop.

---

[24] Izz a-din al Qassam Brigades is Hamas' military wing

192.    Since Bashar al Assad took office in 2000, Israeli authorities have uncovered numerous HAMAS and other activists who were recruited in various Arab countries and sent to Syria for terrorist training.   The recruits received weapons training as well as lessons in intelligence activities, hostage taking, suicide operations, and the preparation of explosives.   Moreover, Syrian officials have themselves urged HAMAS, PIJ and other terrorist groups to increase attacks. Since 2000, dozens of HAMAS attacks have been linked to the Bashar al Assad regime.[25] In May 2002, for example, Damascus reportedly offered Hamas direct financial aid if it revived its tactic of suicide bombings. [26]

193.    Documents seized by the Israel Defense Force ("IDF") in the West Bank show the Palestinian Authority's awareness of the support given by the Syrian regime to HAMAS. The documents revealed that direct financial support to operative cells of HAMAS responsible for terror attacks, including suicide attacks, were funneled from and through Syria.

194.    The significant support provided by the Bashar al Assad regime to HAMAS continues to this day. On February 28, 2009, Musa Abu Marzouk, the Vice-Chairman of HAMAS' political

---

[25]

    a.   On September 30, 2001 the Israeli Security Agency ("ISA") announced the capture of over 20 member of a HAMAS cell who had received training in Syria and Lebanon, some of whom were involved in planning two suicide bombings in Netanya in April and May 2001 that killed 8 Israelis

    b.   In December 2001, the ISA announced that 15 members of a HAMAS cell in Jerusalem had been arrested, including Tarek Akesh, a bombing expert who received training in Syria. Highly sophisticated bombs made by Akesh were reportedly used in the June 2001 bombing of the Dolphinarium disco in Tel Aviv, which killed 21 and wounded 120 mostly teenagers, and in the Sbarro Pizzeria bombing in Jerusalem that killed 15 and wounded 130 mothers and children.

    c.   The HAMAS cell is also responsible for several bombings in 2002, including a Jerusalem cafe in March, a Rishon Lezion pool hall in May, and a Hebrew University cafeteria in July, resulting in a total of 35 deaths and 170 wounded. The cell received its orders from the HAMAS office in Damascus.

    d.   Two bombings in Netanya in 2002 include the Park Hotel in March and outside a shopping mall in May, which killed a total of 34 and wounded 190 people.   The bombings were masterminded by Qassam Brigades Commander Abbas al-Sayyid, who reportedly maintained contact with HAMAS leaders in Damascus and received tens of thousands of dollars from the Damascus-based HAMAS headquarters.

    e.   A bomb that killed 15 and wounded 31 at a restaurant in Haifa in March 2002 was built by Qeis 'Adwan, a HAMAS bomb-maker who, according to the ISA, was in touch with HAMAS headquarters in Syria.

[26]    Exhibit 4548

bureau, said in an interview to *Al Hayat,* the daily newspaper, "Syria is a friend of HAMAS and a friend of the Palestinian People.  We have a presence in Syria and we receive all the support, easing [of restrictions and regulations] and the welcome."

195.    In May 2001, about seven months after the beginning of the Second Intifada, the Syrian government initiated the establishment of the Popular Arab Syrian Committee for Supporting the Intifada and Resisting the Zionist Plan (the "Syrian Intifada Committee"). President Bashar al Assad personally authorized the formation of this committee and appointed as its Chairman Ahmad Abdul Karim, a writer, intellectual, and retired colonel in the Syrian armed forces who served in many ministerial and diplomatic positions during the 1960's and 1970's.

196.    The Syrian Intifada Committee's objective was to collect donations for the support of the Intifada. Since its establishment the Committee has collected at least $20 million through its branches and sub-committees located throughout the Syrian provinces.  Approximately $14 million of which was collected within the first year of the Committee's activity. [27]

197.    The Palestinian press has also covered the Committee's activity. *Al Hayat* reported, on October 6, 2001, that The Syrian Intifada Committee had announced its plan to transfer 170 million Syrian Pounds (U.S. $3.4 million) as the first round of payments to families of martyrs ("shohada") and prisoners and to other beneficiaries in the Palestinian territories.

198.    According to a report taken from *Tishreen,* another Syrian daily newspaper, at the opening-event of a subcommittee of the Syrian Intifada Committee in Latakia, Syria, the participants, including leaders of the ruling Ba'ath party and the managers of the Syrian Intifada Committee, spoke in favor of martyrdom, suicide attacks and jihad against Israel.

199.    Following the establishment of HAMAS in the Gaza Strip, the Syrian Intifada Committee maintained close relations with HAMAS leaders. A large part of the Committee's aid was sent to

Gaza and its members held meetings with senior HAMAS leaders such as Mahmud Al Zahar. During that time, the Committee's activity was perceived in the Arab world, as "A Syrian campaign to support HAMAS financially."

200.   In order to collect the donations, the Syrian Intifada Committee opened several bank accounts. A unified account was opened at the Real Estate Bank of Syria ("REB") and many accounts were opened at the Commercial Bank of Syria ("CBS"). CBS is a bank that is well known for its support of terrorism and involvement in money laundering. On May 11, 2004, the U.S. Treasury designated CBS, pursuant to Section 311 of the USA Patriot Act, as a financial institution of primary money laundering concern.

201.   On March 9, 2006, after years of investigation, the U.S. Treasury finalized its designation of CBS. A communiqué issued by Stuart Levey, the Treasury Under Secretary for Terrorism and Financial Intelligence, said that the CBS had been used by terrorists to move money and *"as a state-owned entity with inadequate money laundering and terrorist financing controls, the Commercial Bank of Syria poses a significant risk of being used to further the Syrian Government's continuing support international terrorist groups."* Hezbollah, PIJ, the PFLP and HAMAS were listed as customers or account holders of CBS.

202.   Official reports of the U.S. State Department, especially during the years 2000 to 2008, leave no doubt that Syria has strong ties with HAMAS and that the Syrian regime has supported HAMAS continuously since the early 1990s.

203.   The U.S. State Department reports note that HAMAS and other Palestinian terrorist organizations operating out of their headquarters in Damascus publicly claim responsibility for deadly terrorist attacks committed by members in Israel, the West Bank and Gaza.

---

[27]   The Syrian Intifada Committee remained active at least until 2009

204.    In the 1990's PIJ came to depend primarily on Syria for military and financial means as well as for its base of operations. The headquarters and command of the PIJ is in Damascus and PIJ leader Ramadan Abdullah Shallah operates out of Damascus along with his deputies. The PIJ support comes directly from the Syrian government and funds that are transferred from Damascus to the personal bank accounts of individual PIJ terrorists to aid them in purchasing arms and to pay for their terrorist activities.

205.    The PIJ's headquarters in Damascus provide extensive funding to PIJ operatives in the Palestinian Authority territories, publish responsibility for terrorist attacks and conduct propaganda activities in Syria. These activities are carried out on a daily basis and with the personal involvement of the senior PIJ operatives located in Syria.

206.    The material support by the Bashar government, his ministries and army to terrorist organizations such as PIJ, Hezbollah and the AAMB include support from the Syrian army in allowing training to be conducted on its army bases, and support from the Ministry of Defense and Foreign Affairs, and the Syrian Intelligence (all necessary co-conspirators) in transferring of weapons, money and operatives in and out of Lebanon and the Palestinian territories without detection by providing false passports and the use of the Syrian borders for safe transit, among others.

207.    Many deadly terrorist attacks committed by PIJ in Israel, the West Bank and the Gaza Strip were planned in Syria and the attacks' fingerprints have led to PIJ's headquarters in Damascus. In these attacks hundreds of civilians, including U.S. citizens, were killed and thousands were wounded. From their Syrian safe-haven PIJ leaders, with the help of organizations such as the AAMB and Hezbollah actively launch terrorist operations, including the attacks which injured Plaintiffs.

208.    The leadership in Damascus has given its approval to PIJ to reach an agreement with Fatah/AAMB elements for the purpose of carrying out joint attacks; these attacks have been planned in Syria and carried out against Israel.

209.    Weapons provided by Iran to Hezbollah regularly pass through Syria with the knowledge, encouragement and aid of the Syrian Military Intelligence, Syrian Armed Forces and the Ministry of Defense, who although responsible for protecting the borders and passport control continuously allowed weapons to reach their destination. These same weapons were used against Israeli and American citizens and visitors to Israel almost every day during the Intifada.

300.    PIJ leadership in Syria maintains close contact with operational activists of the group. Directions from Ramadan Abdullah Shalah, the head of PIJ living in Damascus, are given to PIJ operatives in the West Bank. Interrogations of senior PIJ operational activists from PA controlled Jenin such as Thabet Azmi Suleiman Mardawi, who was arrested by the IDF, reveals the nature of the ongoing direction and control of PIJ from Damascus, Syria. (Mardawi was responsible for the death of 20 people and injury of 150 others[28])

301.    Another Damascus-West Bank link is Ali Suleiman al-Sa'adi (A.K.A "Safuri"), who was involved in numerous terrorist attacks in Israel.  Ali Safuri and Thabet Mardawi admitted that they regularly contacted Ramadan Shalah to discuss various subjects, such as clarification regarding the policies of PIJ leadership in Damascus, claims of responsibility by PIJ headquarters in Damascus for terrorist attacks carried out by PIJ members, requests for money and receiving instructions regarding arms production. Mardawi and Ali Safuri also received email messages containing instructions for explosive charge production and including sketches

---

[28] In his interrogation, Thabet Mardawi confessed to his involvement in numerous terrorist attacks in Israel, among them: a car explosion in Hadera central bus station on May 25, 2001; a suicide attack in Binyamina on July 16, 2001; a suicide attack in a restaurant in Kiryat Motzkin on August 22, 2001; a suicide attack in a bus route from Tel-Aviv to Nazareth on March 20, 2002.

out of the Damascus headquarters. Ali Safuri admitted in his interrogation that from November - December 2001, he resolved to carry out a joint terrorist attack with the Fatah\AAMB. As a senior PIJ activist, he needed (and received) the approval of the PIJ leadership in Syria to reach an agreement with Fatah/AAMB on the perpetration of joint terrorist attacks.

302.   On the financial level, documents seized by Israeli forces give specific details regarding how Shalah transferred funds from Damascus to the personal bank accounts of PIJ operatives. Thabet Mardawi and Ali Safuri admitted that they received large sums of money from the PIJ headquarters in Damascus and opened several bank accounts in their names or in the names of a female relative (in order to conceal their activity). The headquarters in Damascus would transfer the monies to these accounts via the Arab Bank. In one case, a sum of $31,000 was to be given to Ali Safuri and was referred to in the documents as "the remainder of the expenses" of the suicide bombing in Afula which took place on November 27, 2001. In another case, Shalah sent Bassam al-Sa'adi, a PIJ member who was in charge of finances in Jenin, an amount of $127,000 to "aid the families of those killed or arrested."

303.   The large sums of money which were transferred from Syria to PIJ terrorist activists in Jenin greatly improved PIJ capabilities and enabled it to become a leading terrorist organization. Many terrorist attacks originated from the Jenin area, mainly suicide attacks.[29] According to a document seized by the IDF and written by the Palestinian General Intelligence Apparatus, the money enabled PIJ activists to finance attacks carried out by members of the Fatah/AAMB. The PIJ activists also helped the families of dead Fatah activists, bribed PA security members and encouraged the Fatah/AAMB to carry out joint terrorist attacks in Israel.

304.   For example, Muhammad Mahmud Isma'il Barawish ("Barawish"), a senior PIJ commander in the Hebron area, admitted in his interrogation that he received instructions and

funds Akram Al-Ajuri in the PIJ headquarters in Damascus Syria.[30]  In April 2001 Ajuri asked

Barawish to assume the position of PIJ leader in Hebron and assume the responsibility for the

contacts between PIJ cell in Hebron and its headquarters in Damascus.  Around mid-2001, Ajuri

ordered Barawish to recruit military activists who could carry out "*quality attacks*".  Barawish

recruited activists willing to commit terrorism and paid them large sums of money, which he

received, for this purpose, from Syria.  In total, Barawish transferred more than $100,000 to

finance the terrorist network he established in the Hebron area.  Thereafter, Barawish and his

recruits carried out numerous terrorist attacks against civilians in Israel.  Barawish said in his

interrogation that he reported to the headquarters in Syria about a series of terrorist attacks he

carried out, including attacks involving Plaintiffs: the Harsina junction attack in Hebron, the

attacks in the Halhul bypass road, in Bet Shemesh, in French Hill in Jerusalem and others.

305.    Israeli security forces arrested a number of PIJ operatives who were directly involved in a

wide range of terrorist activities in the area of Hebron in late 2002.[31]  Subsequent investigations

revealed that the terrorists received their operational orders and financing from PIJ Headquarters

in Syria. Most significant was the revelation that the PIJ headquarters in Damascus was also

providing detailed operational directives to the Hebron PIJ members, ordering them to intensify

their armed operations and to supplement them with suicide bombings.

306.    In addition to the PIJ cells in the Hebron and Jenin areas, there are documents indicating

that money was being sent from Damascus to the PIJ cell in Bethlehem through Jordan and then

to [an account at] the Cairo-Amman bank.

---

[29] Jenin was called "the capital of the suicide bombers".
[30] Akram Ajuri is a senior PIJ activist in Damascus, who is engaged in directing operational activity in the PA areas.
[31] For example: the shooting attack at a Border Guard patrol moving among a crowd of Jewish worshippers along 'Worshippers Way' in Hebron on November 15, 2002; the shooting attack at the Jewish Seminary High School in Othniel on December 27, 2002.

307.    The flow of money from Damascus to PIJ in Jenin is said to be so massive that the organization has been able to contribute money to other terrorist groups including the AAMB.

308.    In addition, Fatah/AAMB, along with senior intelligence apparatuses of the PA in the Jenin area, cooperate with PIJ and HAMAS in order to carry out terror attacks inside Israel (for example, the Afula suicide terror attack, November 27 2001).

309.    Plaintiffs were injured by the outrageous acts of terrorism planned and perpetrated by HAMAS, PIJ and the AAMB as indicated above.

310.    The individually named Defendants performed acts within the scope of their agencies and within the meaning of 28 U.S.C. §1605, which caused and contributed to the injuries of the U.S. citizens and U.S. nationals named in this Complaint.[32]

311.    Defendants, directly and indirectly through their agents and instrumentalities aided and abetted and conspired with HAMAS, PIJ and AAMB by providing such terrorist entities with the financial support, training, weapons, safe haven, incitement which were instrumental in achieving the physical and mental anguish committed against Plaintiffs from 2001 through 2006.

312.    The Defendants, directly and indirectly, through their agents and instrumentalities, provided material support via financing, training, weapons, safe haven, encouragement, incitement to Hamas, PIJ and the AAMB and affiliated terrorist organizations (such as Hezbollah) who operated jointly with Hamas, PIJ and the AAMB in directing terror attacks

---

[32] 31 CFR §560.304
§560.304 Government of Iran. The term "Government of Iran" includes:
(a) The state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof;
(b) Any entity owned or controlled directly or indirectly by the foregoing;
(c) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and
(d) Any person or entity designated by the Secretary of the Treasury as included within paragraphs (a) through (c) of this section.

against Israeli civilians.  The defendants knew or should have known that this support would be used to fund and incite jihad and terrorism against Jews, Israelis, Americans and others in Israel.

313.    By providing myriad avenues along which to direct, support, incite and fund terrorist activities, The Islamic Republic of Iran and The Arab Republic of Syria revealed their relationships with HAMAS, PIJ and the AAMB.  Each and every one of the Defendants, and their respective agents, collaborated, designed, directed, incited, financed, provided material support, aided, abetted and executed acts of terror with HAMAS, PIJ and the AAMB. All the named Defendants are agents and instrumentalities of Iran and Syria and essential participants in launching the deadly terrorists attacks, including the attacks which injured or killed Plaintiffs. As such, Defendants are directly and jointly and severally liable for the injuries suffered by Plaintiffs and should, therefore, be held accountable.

## COUNT I

### CLAIM OF BENYAMIN ANDREW PILANT
### PURSUANT TO 28 U.S.C. §1605A
### AND IN ACCORDANCE WITH FEDERAL AND STATE COMMON LAW FOR

### ASSAULT

314.    Plaintiff, Benyamin Andrew Pilant, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

315.    On December 12, 2001, members of HAMAS  intentionally, deliberately and willfully placed the Plaintiff in reasonable fear and apprehension of serious bodily harm and/or death when they fired weapons and detonated explosive devices at and near the passenger bus on which Plaintiff was a passenger, killing ten (10) and injuring forty (40) people on the bus.  As a direct result of their actions, Plaintiff has suffered psychological trauma that the HAMAS terrorists inflicted upon him.  The willful, wrongful, and intentional acts of HAMAS, which were

made possible by Defendants who provided material support and resources, resulted in injury to Plaintiff including extreme mental anguish, and pain and suffering.

WHEREFORE, Plaintiff, Benyamin Andrew Pilant, demands that judgment be entered against Defendants, jointly and severally, in the amount of THIRTY MILLION DOLLARS ($30,000,000), plus costs.

## COUNT II

### CLAIM OF BENYAMIN ANDREW PILANT PURSUANT TO 28 U.S.C. §1605A AND IN ACCORDANCE WITH FEDERAL AND STATE COMMON LAW FOR

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

316.    Plaintiff repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

317.    As a direct and proximate result of the willful, wrongful and intentional acts of HAMAS members, whose acts were funded, materially supported, directed, trained, expertly advised and assisted by Defendants, Plaintiff endured and continues to endure extreme psychological and emotional distress and permanent mental impairment causing expenses for medical care and counseling.

WHEREFORE, Plaintiff, Benyamin Andrew Pilant, demands that judgment be entered against Defendants, jointly and severally, in the amount of THIRTY MILLION DOLLARS ($30,000,000), plus costs.

## COUNT III

### CLAIMS OF REBECCA PILANT, SAMUEL PHILIPS HAISTINGS PILANT, ROBERT ELIOT HAISTINGS PILANT, ELIZABETH ANNA HAISTINGS PILANT, FOR LOSS OF SOLATIUM/CONSORTIUM/LOSS OF SERVICES CLAIM PURSUANT TO 28 U.S.C. §1605A AND IN ACCORDANCE WITH THE FEDERAL AND STATE COMMON LAW FOR INTENTIONAL INFLICTION OF

## EMOTIONAL DISTRESS

318.    Plaintiffs Rebecca Pilant, Samuel Philips Haistings Pilant, Robert Eliot Haistings Pilant, and Elizabeth Anna Haistings Pilant, repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

319.    As a further and direct proximate result of willful, wrongful, intentional, and reckless acts of HAMAS members, whose acts were funded and directed by Defendants, Plaintiffs have been deprived of the assistance, society, and companionship of their husband and father, Benyamin Andrew Pilant.  This injury to their father, caused each of them to suffer, among other things, extreme mental anguish, grief and emotional and physical pain and suffering.

320.    The Defendants knew or should have known that the attack would in all likelihood cause tremendous emotional distress to family members of the passengers upon whom they perpetrated their assault.

321.    The conduct described above was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community and the emotional distress suffered by Plaintiffs was so severe that no reasonable person could be expected to endure it.

322.    As a direct and proximate result of the extreme and outrageous actions of Defendants, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs, Rebecca Pilant, Samuel Philips Haistings, Robert Elliot Haistings, and Elizabeth Anna Haistings demand that judgment be entered against Defendants, jointly and severally, in the amount of THIRTY MILLION DOLLARS ($30,000,000), plus costs.

## COUNT IV

## CLAIMS OF BENYAMIN ANDREW PILANT, REBECCA PILANT, SAMUEL PHILIPS HAISTINGS PILANT, ROBERT ELIOT HAISTINGS PILANT, ELIZABETH ANNA HAISTINGS PILANT PURSUANT TO 28 U.S.C. §1605A PUNITIVE

### DAMAGES

323.    Plaintiffs Benyamin Andrew Pilant, Rebecca Pilant, Samuel Philips Haistings, Robert Elliot Haistings, Elizabeth Anna Haistings repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

324.    The actions of the terrorists, as above set forth, were intentional and malicious and in willful, wanton and reckless disregard of Plaintiffs' rights and physical well-being and the standards of law that govern civilized nations. The result of loss of life and/or serious bodily injury was intended and foreseen by each Defendant. All of the acts of HAMAS were facilitated by material support and resources, funding, training, direction, expert advice and assistance of the Defendants. The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C. §1605A, Plaintiff is thereby entitled to punitive damages.

WHEREFORE, Plaintiffs, Benyamin Andrew Pilant, Rebecca Pilant, Samuel Philips Haistings, Robert Elliot Haistings and Elizabeth Anna Haistings, demand that judgment be entered against Defendants, jointly and severally, in the amount of TWO HUNDRED AND FIFTY MILLION DOLLARS ($250,000,000), plus costs.

### COUNT V

### CLAIM OF YEHIZKIYAHO TZVI KATZ PURSUANT TO 28 U.S.C. §1605A AND PURSUANT TO FEDERAL AND STATE COMMON LAW FOR

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

:

325.    Plaintiff repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

326.    The Defendants knew or should have known that the shooting attack of the vehicle driven by Plaintiff's wife, Orit Katz in which his children were passengers, would in all likelihood cause tremendous emotional distress to family members of the passengers upon whom they perpetrated their assault.

327.    As a direct and proximate result of the willful, wrongful and intentional acts of HAMAS members, whose acts were funded, materially supported, directed, trained, expertly advised/assisted by Defendants, Plaintiff, father and husband of victims endured extreme mental anguish and pain and suffering, emotional distress and anxiety, severe and permanent psychological distress and permanent mental impairment causing expenses for medical care and counseling.

WHEREFORE, Plaintiff, Yehizkiyaho Tzvi Katz, demands that judgment be entered against Defendants, jointly and severally, in the amount of THIRTY MILLION DOLLARS ($30,000,000), plus costs.

## COUNT VI

### CLAIM OF YEHIZKIYAHO TZVI KATZ
### PURSUANT TO 28 U.S.C. §1605A

### LOSS OF SOLATIUM/CONSORTIUM/LOSS OF SERVICES CLAIM

328.    Plaintiff YEHIZKIYAHO KATZ, US citizen, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

329.    As a direct and proximate result of willful, wrongful, intentional, and reckless acts of HAMAS members, whose acts were funded and directed by Defendants, Plaintiff was deprived

of the assistance, society, and companionship of his (wife and) children, while they were recuperating from their physical and emotional injuries. This loss caused him to suffer, among other things, extreme mental anguish, grief and emotional and physical pain and suffering.

330.   The conduct described above was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community and the emotional distress suffered by Plaintiff was so severe that no reasonable person could be expected to endure it.

331.   As a direct and proximate result of the intentional infliction of emotional distress and extreme and outrageous actions of Defendants, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, Yehizkiyaho Katz, on his own behalf and as father and legal guardian, and legal and personal representative to Ruth Katz, Noam Yehuda Katz, and Roni Hava Katz, demands that judgment be entered against Defendants, jointly and severally, in the amount of THIRTY MILLION DOLLARS ($30,000,000), plus costs.

**COUNT VII**

**CLAIM OF YEHIZKIYAHO TZVI KATZ
PURSUANT TO 28 U.S.C. §1605A**

**<u>PUNITIVE DAMAGES</u>**

332.   Plaintiff, Yehizkiyaho Katz, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

333.   The actions of the gunmen as set forth above, were intentional and malicious and in willful, wanton and reckless disregard of the victims Ruth Katz, Noam Yehuda Katz and Roni Hava Katz rights and physical wellbeing and the standards of law that govern civilized nations. The result of loss of life and/or serious bodily injury was intended and foreseen by each

Defendant.  All of the acts of HAMAS were facilitated by material support and resources, funding, training, direction, expert advice and assistance of the Defendants.  The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants.  In accordance with the provisions of 28 U.S.C. §1605A, Plaintiff is thereby entitled to punitive damages.

WHEREFORE, Plaintiff demands that judgment be entered against Defendants, jointly and severally, in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000), plus costs.

**COUNT VIII**

**CLAIM OF BATSHEVA SHOHAM**
**PURSUANT TO THE PROVISIONS OF 28 U.S.C. § 1605 and**
**§ 1605A AS AMENDED AND 16 D.C. CODE § 16-2701**

**WRONGFUL DEATH OF YEHUDA SHOHAM**

334.    Plaintiff, Batsheva Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

335.    The actions of Defendants as described above violated the provisions of 28 U.S.C. § 1605 and § 1605A as amended and 16 DC Code 16-2701

336.    The Defendants, through their agents financed the attacks, and rendered material support to the activities of the AAMB that resulted in the serious injuries and subsequent death of five (5) month old Yehuda Shoham, son of Batsheva Shoham, on June 5, 2001 in a vicious attack in Israel.  Those agents were at all times acting within the scope of their agency, and acted on and at the direction of the Defendants, who incited, financed, aided and abetted, conspired with and rendered material support and resources, training and expert advice and assistance to the terrorists responsible.

337.   Batsheva Shoham, a US citizen, as a direct and proximate consequence of the actions of members of the AAMB, for which the Defendants are vicariously, jointly and severally liable, suffered pecuniary loss, including assistance to the beneficiary, the loss of future earnings and accretions to the Estate of Yehuda Shoham, medical care up until the time of death, and the funeral and burial expenses.

WHEREFORE, Plaintiff, Batsheva Shoham individually and as legal and personal representative of the Estate of Yehuda Shoham, demands judgment on behalf of herself and the Estate of Yehuda Shoham, jointly and severally, against Defendants, in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT IX

### CLAIM OF BATSHEVA SHOHAM
### PURSUANT TO
### 12 D.C. CODE § 12-101 AND 28 U.S.C. § 1605A

### SURVIVAL CLAIM FOR DEATH OF YEHUDA SHOHAM

338.   Plaintiff, Batsheva Shoham individually and as legal and personal representative of Yehuda Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

339.   The minor victim, Yehuda Shoham, from the time of injury until his death, suffered extreme bodily pain and suffering as a result of the actions described above which were undertaken by the agents of the Defendants.

WHEREFORE, Plaintiff, Batsheva Shoham individually and as legal and personal Representative of the Estate of Yehuda demands judgments, jointly and severally, against the, Defendants in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## CLAIM X

### CLAIM OF BATSHEVA SHOHAM
### PURSUANT TO 28 U.S.C. § 1605A AND
### IN ACCORDANCE WITH FEDERAL AND STATE COMMON

### LAW FOR ASSAULT

340.   Plaintiff, Batsheva Shoham, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

341.   The members of  the AAMB as above alleged, intentionally and willfully placed the Plaintiff, in fear and apprehension of harm as a direct result of their actions including the psychological trauma and abuse they inflicted upon her, when they attacked the vehicle, in which she was a passenger, along with her husband and baby, and murdered her child. The willful, wrongful, and intentional acts of the AAMB were provided with material support and resources by Defendants, and the Plaintiff was injured in that he endured extreme mental anguish, injury and pain and suffering.

WHEREFORE, Plaintiff, Batsheva Shoham demands judgment jointly and severally against Defendants, in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

### COUNT XI

### CLAIMS OF BATSHEVA SHOHAM
### PURSUANT TO 28 U.S.C. § 1605A AND PURSUANT TO THE FEDERAL AND STATE
### COMMON LAW FOR SOLATIUM AND INTENTIONAL INFLICTION AND NEGLECT
### INFLICTION OF EMOTIONAL DISTRESS

### SOLATIUM AND EMOTIONAL DISTRESS

342.   Plaintiff, Batsheva Shoham individually and as administrator of the Estate of Yehuda Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

343.   As a direct consequence of the actions of the Defendants, the Plaintiff has suffered extraordinary grief and mental anguish, in that the Defendants, acting through their agents and co-conspirators, by their conduct intended through infliction of physical injury to the Shoham family which resulted in the serious injury and death upon her child, Yehuda Shoham, so as to cause severe emotional distress mental anguish, grief and bereavement upon, Batsheva Shoham, Yehuda Shoham's natural guardian at the time of the attack. Furthermore, as a direct consequence of the action of the Defendants, the Plaintiff has suffered the loss of her child's society and comfort.

344.   The conduct described above was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community and the emotional distress of the attack on her person and on her family which resulted in the loss of a child, suffered by Plaintiff was so severe that no reasonable person could be expected to endure it.

345.   As a direct and proximate result of the intentional infliction of emotional distress and extreme and outrageous actions of Defendants, Plaintiff has suffered damages.

WHEREFORE, Plaintiff, demands judgment jointly and severally against Defendants in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT XII

### CLAIMS OF BATSHEVA SHOHAM AND ESTATE OF YEHUDA SHOHAM

### PUNITIVE DAMAGES PURSUANT TO 28 U.S.C. § 1605A

346.   Plaintiff Batsheva Shoham individually and as administrator of the Estate of Yehuda Shoham repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

347.   The actions of the Defendants, as carried out by their agents the AAMB as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations (law of nations) and international law.  The loss of life as above described was intended as a result by each Defendant. The decedent was not engaged in war or in police duties, but was a civilian and a five month old baby.  The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C. § 1605A, the estate of decedent is thereby entitled to punitive damages.

WHEREFORE, Plaintiff, demand judgments on behalf of herself and the Estate of Yehuda Shoham, jointly and severally, against Defendants, in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000) plus costs.

## COUNT XIII

### CLAIMS OF BATSHEVA SHOHAM AND ESTATE OF YEHUDA SHOHAM PURSUANT TO

### THE TORTURE VICTIMS PROTECTION ACT 1991 P.L. 102-256

348. Plaintiff Batsheva Shoham on her own behalf and as administrator of the Estate of Yehuda Shoham, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

349.   The action of the defendants as described above subjected the plaintiff to extrajudicial killing, attempted killing and torture within the meaning of the Torture Victims Protection Act 1991, Pub. L. 102-256, 106 Stat.

350.   In carrying out the extrajudicial act of killing, attempted killing and torture against the Yehuda Shoham child of Batsheva Shoham, the actions of each Defendant was conducted under

actual or apparent authority of under color of law, of the foreign nations of the Islamic Republic of Iran and the Syrian Republic.

351.    As a result of the defendants' violation of the TPVA, plaintiff suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

WHEREFORE, Plaintiff, Batsheva Shoham who is a US nationals and/or citizen demand judgment in their favor against Defendants jointly and severally and demands damages in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT XIV

### CLAIMS OF ESTER DESTA, NECHAMA RINA DESTA AND SHIFRA BASMAT DESTA PURSUANT TO 28 U.S.C. § 1605A AND PURSUANT TO FEDERAL AND STATE COMMON

### LAW FOR ASSAULT

352.    Plaintiffs, Ester Desta a/k/a Phyllis Elaine Eigner; Nechama Rina Desta and Shifra Basmat Desta all US citizens repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

353.    The members of the AAMB terrorist organization as above alleged, intentionally and willfully placed the Plaintiffs, in fear and apprehension of harm, inflicting severe psychological trauma and abuse upon them, as a direct result of having one of its members blow himself up at crowded civilian bus stop in Jerusalem, at which Esta Desta and her minor daughters Nechama Rina and Shifra Basmat were standing. The willful, wrongful, and intentional acts of the AAMB were provided with material support and resources by Defendants, and the Plaintiffs were injured in that they endured extreme mental anguish, injury and pain and suffering.

WHEREFORE, Plaintiffs demand judgment jointly and severally against Defendants in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT XV

## CLAIMS OF ESTER DESTA, NECHAMA RINA DESTA AND SHIFRA BASMAT DESTA PURSUANT TO 28 U.S.C. § 1605A AND PURSUANT TO THE FEDERAL AND STATE COMMON LAW FOR SOLATIUM AND INTENTIONAL INFLICTION AND NEGLECT INFLICTION OF EMOTIONAL DISTRESS

### SOLATIUM AND EMOTIONAL DISTRESS

354.   Plaintiffs and victims Ester Desta, Nechama Rina Desta and Shifra Basmat Desta, all US citizens, repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

355.   As a direct and proximate result of the willful, wrongful and intentional acts of AAMB members, whose acts were funded, materially supported, directed, trained, expertly advised/assisted by Defendants, the plaintiffs, victims Esther Desta, her minor children Nechama Rina Desta and Shifra Basmat Desta endured extreme mental anguish and pain and suffering, and were subjected to intense emotional injury, pain, discomfort and inconvenience.

WHEREFORE, Plaintiffs Esther Desta, Nechama Rina Desta and Shifra Basmat Desta demand judgment jointly and severally against Defendants, in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT XVI

## CLAIMS OF ESTER DESTA, NECHAMA RINA DESTA AND SHIFRA BASMAT DESTA PURSUANT TO 28 U.S.C. § 1605A

### PUNITIVE DAMAGES

356.   Plaintiffs Ester Desta, Nechama Rina Desta, Shifra Basmat Desta  repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

357.   The actions of the terrorists, as above set forth, were intentional and malicious and in willful, wanton and reckless disregard of Plaintiffs' rights and physical wellbeing and the standards of law that govern civilized nations. The loss of life or serious injury was intended a result by each Defendant. The victims were not engaged in war or in police duties at the time of the attack.

358.   All of the acts of the AAMB were facilitated by material support and resources, funding, training, direction, expert advice and assistance of the Defendants. The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C. § 1605A, Plaintiffs are thereby entitled to punitive damages.

WHEREFORE, Plaintiffs Ester Desta, Nechama Rina Desta, Shifra Basmat Desta demand judgment jointly and severally against Defendants the in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000) plus costs.

## COUNT XVII

### CLAIM OF CHANA MUSAI
**PURSUANT TO 28 U.S.C. § 1605A AND PURSUANT TO THE FEDERAL AND STATE COMMON LAW FOR SOLATIUM AND INTENTIONAL INFLICTION AND NEGLECT INFLICTION OF EMOTIONAL DISTRESS**

### SOLATIUM AND EMOTIONAL DISTRESS

359.   Plaintiff, Chana Musai, US citizen and mother of the victim Dvir Musai, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

360.   As a direct consequence of the actions of the Defendants, Plaintiff who is the mother to the victim has suffered extraordinary grief and mental anguish, in that the Defendants, acting through their agents and by their conduct of planting a roadside charge by her child's school bus,

intended through infliction of physical injury resulting in the serious injury upon victim Dvir Mosai, who was merely fourteen (14) years old at the time of the attack.

361.    The conduct described above was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community and the emotional distress suffered by Plaintiff, mother of the victim, was so severe that no reasonable person could be expected to endure it.

362.    As a direct and proximate result of the intentional infliction of emotional distress and extreme and outrageous actions of Defendants, Plaintiff Chana Mosai has suffered damages.

WHEREFORE, Plaintiff, Chana Musai demands judgment jointly and severally against Defendants in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

## COUNT XVIII

## CLAIM OF PLAINTIFF CHANA MUSAI
## PURSUANT TO 28 U.S.C. § 1605A

## PUNITIVE DAMAGES

363.    Plaintiff, Chana Musai, mother of the victim Dvir Musai repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

364.    The actions of the terrorists, as above set forth, were intentional and malicious and in willful, wanton and reckless disregard of the Plaintiff's rights and physical wellbeing and of life and the standards of law that govern civilized nations. The loss of life or serious injury was intended as a result by each Defendant.  Neither the victim – Dvir Mosai a minor at the time, nor the Plaintiff were engaged in war or in police duties at the time of the attack.

365.    All of the acts of the AAMB, agent of Defendants were facilitated by material support and resources, funding, training, direction, expert advice and assistance of the Defendants. The

actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C. § 1605A, Plaintiffs are thereby entitled to punitive damages.

WHEREFORE, Plaintiff, Chana Musai, mother of the victim Dvir Musai demands judgment jointly and severally against Defendants the in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000) plus costs.

## COUNT XIX

### CLAIM OF RACHEL SIBONI,
**PURSUANT TO 28 U.S.C. § 1605A AND PURSUANT TO THE FEDERAL AND STATE COMMON LAW FOR SOLATIUM AND INTENTIONAL INFLICTION AND NEGLECT INFLICTION OF EMOTIONAL DISTRESS**

### SOLATIUM AND EMOTIONAL DISTRESS

366.    Rachel Siboni, US citizen, sister of victim Hana Ichai repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

367.    As a direct consequence of the actions of the Defendants, Plaintiff has suffered extraordinary grief and mental anguish, in that the Defendants, acting through their agents, the PIJ, and by their conduct intended through infliction of physical injury resulting in the serious injury on Hana Annette Ichai, when on April 17, 2006, a PIJ bomber named Samer Hamad, blew himself up in a restaurant in Tel-Aviv, injuring eighty people including Hana Ichai, sister of plaintiff Rachel Siboni. The conduct described above was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community and the emotional distress suffered by Plaintiff was so severe that no reasonable person could be expected to endure it.

368.   As a direct and proximate result of the intentional infliction of emotional distress and extreme and outrageous actions of Defendants, Plaintiff has suffered damages.

WHEREFORE, Plaintiff Rachel Siboni, demands damages against Defendants in the amount of THIRTY MILLION DOLLARS ($30,000,000) plus costs.

**COUNT XX**

**CLAIM OF RACHEL SIBONI
PURSUANT TO 28 U.S.C. § 1605A**

**PUNITIVE DAMAGES**

369.   Rachel Siboni, US citizen and sister of victim Hana Annette Ichai repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

370.   The actions of the terrorists, as above set forth, were intentional and malicious and in willful, wanton and reckless disregard of Rachel Siboni's rights and physical wellbeing and the standards of law that govern civilized nations. The loss of life or serious injury was intended a result by each Defendant.  Neither the victim who was 71 years of age or the Plaintiff was engaged in war or in police duties at the time of the attack.

371.   All of the acts of were facilitated by material support and resources, funding, training, direction, expert advice and assistance of the Defendants. The actions of those who carried out the attack described were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of 28 U.S.C. § 1605A, Plaintiff is thereby entitled to punitive damages.

WHEREFORE, Plaintiff demands judgment jointly and severally against Defendants the in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000) plus costs.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues to triable.

Respectfully submitted,

Gavriel Mairone, Esq.
MM~LAW LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
T – (312) 253-7444
F – (312) 275-8590
taxlaw@mm-law.com

Michael Miller, Esq.
Bar No. 397689
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Tel: 540-672-4224
Fax: 540-672-3055
Miller809@aol.com

79